**Thomas GIBBONS and William R. Beiseigel, Plaintiffs,**

v.

**UDARAS na GAELTACHTA and The Industrial Development Authority of Ireland, Defendants.**

**No. 82 Civ. 1360(RJW).**

United States District Court,
S. D. New York.

Oct. 12, 1982.

Freedman, Levy, Kroll & Simonds, Sheldon Z. Kaplan, Washington, D.C. and Kreindler & Kreindler, New York City, for plaintiffs; Joseph H. Sharlitt, Harvey A. Levin, Washington, D.C., Max W. Berger, New York City, of counsel.

Baker & McKenzie, New York City, for defendants; Robert B. Davidson, Brandon T. Davis, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

The complaint filed in this action sets forth claims for (1) breach of contract, (2) an accounting, (3) fraud, (4) tortious interference with contractual relations, and (5) a taking of property in violation of international law. Defendants are Udaras na Gaeltachta ("UG"), an instrumentality of the Republic of Ireland, and the Industrial Development Authority of Ireland ("IDA"), also an instrumentality of the Republic of Ireland. UG and IDA have moved to dismiss the complaint, arguing (1) that the Court lacks subject matter jurisdiction over this action, (2) that the Court lacks personal jurisdiction over both UG and IDA, (3) that the Court should invoke the doctrine of *forum non conveniens,* and (4) that plaintiffs have failed to plead fraud with the particularity required by Rule 9(b), Fed.R. Civ.P. For the reasons hereinafter stated, the Court finds that only the fourth of these arguments has merit. Accordingly, the Court denies the UG–IDA motion insofar as it seeks dismissal of the complaint in its entirety, and grants the UG–IDA motion insofar as it seeks dismissal of plaintiffs' fraud claim.

## BACKGROUND

Analysis of the UG–IDA motion requires a fairly detailed recapitulation of the factual background to this action. To the extent the papers before the Court disclose a factual dispute with respect to an issue relevant to the UG–IDA motion, the Court has liberally construed plaintiffs' version of the facts and has deemed that version to be true for the purpose of deciding this motion. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 303 n.6 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Needless to say, by so doing the Court has not relieved plaintiffs of their trial burden of proving the necessary jurisdictional facts by a preponderance of the evidence. *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1026 (D.C.Cir.1982); *Bialek v. Racal-Milgo, Inc.,* 545 F.Supp. 25, 36 (S.D.N.Y.1982).

The series of events that led to the commencement of this action began in 1973. At that time, plaintiffs were both employed by the Standard T Chemical Company ("Standard"), a New York corporation that was engaged in manufacturing plastic containers used to package cosmetics for sale to the general public. Standard's most popular cosmetics containers were those made from "metallized" plastic. During his employ by Standard, plaintiff Gibbons had acquired a substantial expertise in the production techniques associated with the manufacture of metallized plastic cosmetics containers. Plaintiff Beiseigel, while employed by Standard, had become an expert in marketing such containers to cosmetics manufacturers.

Although metallized plastic cosmetics containers had, by 1974, become quite popular within the United States cosmetics industry, they had not theretofore been extensively manufactured or marketed in Europe. Plaintiffs accordingly perceived a lucrative foreign market for such containers and set about finding a means of exploiting that market through the use of their expertise in the area. Sometime in late 1973, plaintiffs learned of IDA. IDA was then and is today an instrumentality of the Republic of Ireland. It is a not-for-profit entity that exists to encourage foreign industrial development, particularly the creation of new manufacturing facilities, within the Republic of Ireland. To this end, it maintains offices in various countries around the world, including one here in New York City. Projects that qualify for the IDA program are eligible for various forms of governmental assistance, including capital grants from IDA itself and tax incentives made available by Irish law.

In the spring of 1974, plaintiffs informed IDA that they were considering the possibility of starting a manufacturing operation in Ireland for the production of metallized plastic cosmetics containers, and inquired whether such a project might qualify for the IDA program. At that time, no such manufacturing facility existed in Ireland. The initial discussions between plaintiffs and IDA relative to plaintiffs' proposed project took place either over the telephone or via letter. After IDA expressed interest in the project, plaintiffs traveled to New York and met with two representatives of IDA at IDA's office in New York City. At this meeting, plaintiffs were informed of the governmental assistance to which they would be entitled if their project qualified for the IDA program. Among other things, IDA offered to lease plaintiffs a plant in Ireland and to provide a capital grant equal to forty-five percent of the cost of the machinery needed to equip the plant. Shortly after the New York City meeting, plaintiffs traveled to Ireland, at IDA's request, to inspect possible plant sites. However, since both the plant sites and IDA's proposed capital grant proved inadequate for plaintiffs' purposes, the negotiations between plaintiffs and IDA were discontinued in the summer of 1974.

In the late summer or early fall of 1974, plaintiffs once again contacted IDA with regard to their proposed project. IDA informed plaintiffs that they might be able to obtain a larger capital grant and a satisfactory plant site from an entity known as Gaeltarra Eireann ("GE"). GE, the statutory predecessor to defendant UG, was a not-for-profit instrumentality of the Republic of Ireland, and was charged by law with encouraging and assisting the economic development of certain designated Gaelic-speaking areas of Ireland. In similar fashion to the IDA program, a project that qualified for the GE program was eligible for various forms of governmental assistance.

GE, since it was not primarily concerned with encouraging *foreign* investment in the areas for which it was responsible, did not maintain an office in the United States or employ any personnel in the United States. Instead, GE had developed a relationship with IDA (which was a completely separate legal entity under Irish law) pursuant to which United States investors having development projects that seemed likely candidates for the GE program were directed by IDA to contact GE. Under this arrangement, IDA also made its personnel and its

New York City office available to GE in order to facilitate GE's negotiations with those investors who were referred to GE by IDA.

Upon being referred to GE by IDA pursuant to the GE–IDA arrangement just described, plaintiff Gibbons telephoned GE at its office in Ireland and outlined plaintiffs' proposed project. He followed this conversation up with a letter wherein he set forth additional details of the plan. GE responded by scheduling a meeting at IDA's New York City office. The meeting occurred in October 1974, and was attended by plaintiffs, two representatives of IDA, and two representatives of GE. At the meeting, both the general nature and the specific details of plaintiffs' proposal were discussed. The GE representatives informed plaintiffs of the governmental assistance to which they would be entitled in the event their project qualified for the GE program. GE informed plaintiffs that their project could be structured as an "export company," and thereby qualify for certain tax incentives made available by Irish law. Among other things, GE offered to lease plaintiffs a plant in Ireland and to provide a capital grant in the amount of sixty percent of the cost of the machinery necessary to equip the plant. Plaintiffs and GE agreed that the plant would be located in County Galway, Ireland. Plaintiffs and GE also developed a tentative financial structure for the project. IDA, noting that negotiations would henceforth be undertaken primarily between plaintiffs and GE, agreed nonetheless to continue to make itself, its personnel, and its New York City office available to plaintiffs and GE in order to facilitate their continued negotiations and the completion of the arrangements for the project.

After the meeting, plaintiffs set about the task of preparing a formal application seeking to qualify their project for the GE program. After communicating with GE on numerous occasions during the fall of 1974 and the winter of 1974–1975, plaintiffs submitted such an application on March 27, 1975. The spring of 1975 was chiefly occupied with communications between GE and plaintiffs wherein the parties sought to clarify the details of plaintiffs' application. Many of the communications just described were initiated by plaintiffs from IDA's New York City office either via telephone or telex. In June 1975, plaintiffs traveled to Ireland and provided further clarification of the details of their application.

On August 21, 1975, GE sent plaintiffs a formal proposal setting forth the terms under which it would accept plaintiffs' application. Plaintiffs executed this proposal, while in Ireland, on October 17, 1975. Nonetheless, significant financial details of the parties' agreement remained to be worked out. Further negotiations took place during the fall of 1975 and the winter of 1975–1976. During this time, plaintiffs had a second meeting with representatives of GE at IDA's New York City office; however, no substantial negotiations occurred at this meeting. Finally, on May 21, 1976, GE sent plaintiffs an amended proposal wherein GE significantly increased the size of the capital grant that it proposed to make, and also agreed to enlarge its equity participation in the enterprise. Plaintiffs executed this proposal, while in the United States, on June 12, 1976. (The Court hereinafter refers to the agreement executed on October 17, 1975, as amended by the agreement executed on June 12, 1976, as the "Joint Venture Agreement.")

The most important terms of the Joint Venture Agreement were as follows. Plaintiffs were to form an Irish company to engage in the manufacture and export of metallized plastic cosmetics containers. GE agreed (1) to lease the company a factory and three four-bedroom houses located in County Galway, Ireland; (2) to give the company a capital grant in the lesser amount of $420,000 [1] or sixty percent of the

1. For the sake of convenience, the Court has, throughout today's opinion, converted amounts specified by the parties in Irish pounds to their dollar equivalents at the then prevailing ex-

change rate of approximately $2. In the October 17, 1975 agreement, GE promised a machinery capital grant of up to 182,000 Irish pounds. Subsequently, in the June 12, 1976,

cost of any machinery necessary to equip the factory for the manufacturing process contemplated by the parties; (3) to give the company a second capital grant of up to $72,000, to be used towards the cost of training employees to work in the factory; and (4) to purchase twenty-six percent of the outstanding stock of the company up to a total equity investment of $71,000. Plaintiffs agreed (1) to purchase the necessary machinery in the United States and arrange for its delivery to Ireland; (2) to hold at least seventy-four percent of the company's outstanding stock; (3) to move to Ireland to act as the principal directors and officers of the company; and (4) to hire primarily Gaelic-speaking individuals as employees of the company. The Joint Venture Agreement contemplated a two-stage process for development of the Company's manufacturing capacity. During "Stage 1," the parties anticipated that the company would import plastic cosmetics containers and metallize them at the County Galway plant. GE was to make up to $264,000 of the promised machinery capital grant, $40,000 of the promised training capital grant, and $52,000 of the promised equity investment in the course of Stage 1. After Stage 1 had been successfully accomplished, the parties contemplated beginning "Stage 2," at which time the company would start making its own plastic cosmetics containers at the County Galway plant. The Joint Venture Agreement stated that Stage 1 would be begun in 1976, but set no timetable for the completion of Stage 1 or the commencement of Stage 2.

After the parties finalized the Joint Venture Agreement, plaintiffs commenced purchasing the machinery necessary to equip the County Galway plant for the manufacture of metallized plastic cosmetics containers. Plaintiffs purchased this equipment from various suppliers in the United States, at a total cost of $360,000. The equipment was then shipped to Ireland, and arrived at the County Galway plant in November 1976. Plaintiff Gibbons and his family

moved to Ireland in late 1976, and plaintiff Beiseigel and his family moved to Ireland in April 1977.

Prior to moving to Ireland, plaintiffs arranged for the creation of an Irish company, named International Processing & Chemical Teoranta ("IPC"), to conduct the business contemplated by the Joint Venture Agreement. Plaintiff Gibbons and plaintiff Beiseigel each purchased thirty-seven percent of IPC's stock, and GE purchased the remaining twenty-six percent. On October 27, 1976, GE and IPC entered into two agreements. By the first agreement, ("the Lease Agreement"), GE leased the County Galway plant to IPC. The second agreement ("the Machinery Capital Grant Agreement") set forth the terms and conditions of the machinery capital grant that GE was to give IPC during Stage 1 of the project. In the Machinery Capital Grant Agreement, GE promised to grant IPC the lesser amount of $264,000 or sixty percent of the cost of the equipment necessary for Stage 1, on condition that any equipment purchased was new at the time of purchase and installed in a workmanlike manner by July 1, 1978.

Disputes began to arise between plaintiffs and GE almost immediately after IPC began operations in late 1976. According to plaintiffs' complaint, the factory rented to IPC by GE did not meet the specifications set forth in the Lease Agreement and was not ready for occupancy by IPC at the time promised. The three houses promised by GE in the Joint Venture Agreement were not ready for occupancy at the time promised either. GE never provided the $40,000 training capital grant that it had promised, in the Joint Venture Agreement, to make during Stage 1. Most importantly, GE repeatedly withheld scheduled payments under the Machinery Capital Grant Agreement. GE attempted to justify its failure to comply with the Machinery Capital Grant Agreement by claiming that plaintiffs themselves had violated that agree-

---

amendment, GE agreed to provide an additional machinery capital grant not to exceed 28,000 Irish pounds, meaning that the total machinery capital grant contemplated by the Joint Venture Agreement was up to 210,000 Irish pounds, or $420,000.

ment, first by purchasing second-hand machinery for the County Galway plant, and then by billing IPC for this equipment at a price far exceeding its true value. According to plaintiffs, these claims were entirely false and were known by GE to be false at the time they were made.

Notwithstanding the difficulties just mentioned, IPC went into production in the spring of 1978. IPC was ultimately able to secure some of the financing that it had expected to receive from GE by obtaining loans from the Bank of Ireland and from plaintiffs. By mid-summer of 1978, IPC was producing and selling its products, but failing to show a profit. IPC's nonprofitability resulted in large part from the fact that, due to GE's failure to provide the entire machinery capital grant that it had promised in the Joint Venture Agreement and later in the Machinery Capital Grant Agreement, IPC had been unable to purchase sufficient equipment to operate at a full production level.

Matters went from bad to worse during 1979. IPC's continued nonprofitability caused it to fall into default on the loan received from the Bank of Ireland. GE frustrated several IPC attempts to obtain additional financing from various private sources. Finally, in September 1979, the Bank of Ireland called its loan to IPC, throwing the financial operations of the company into total disarray and effectively dooming any remaining possibility that IPC could become a viable business operation. IPC ceased production in February 1980, at which time the County Galway plant was closed. IPC was placed in receivership soon thereafter. Plaintiff Beiseigel returned to the United States to seek other employment, while plaintiff Gibbons remained in Ireland. Together, plaintiffs suffered out-of-pocket losses amounting to $510,000 as a result of their joint venture with GE.

Plaintiffs commenced this action on April 20, 1981, by filing a complaint in the United States District Court for the District of Columbia. The complaint named the Republic of Ireland, IDA, and UG (the statutory successor to GE) as defendants. Five causes of action are set forth in the complaint. In their first cause of action, plaintiffs seek to recover for GE's alleged breach of the Joint Venture Agreement. Plaintiffs' second cause of action alleges that GE misappropriated certain technology and know-how that plaintiffs supplied to IPC pursuant to the Joint Venture Agreement. The third cause of action alleges that GE and IDA made fraudulent misrepresentations, both in United States and abroad, that induced plaintiffs to enter into the Joint Venture Agreement and accordingly caused plaintiffs to suffer the damages that ensued from their participation in the Joint Venture Agreement. Plaintiffs' fourth cause of action alleges that GE tortiously interfered with the contractual relationship between plaintiffs and IPC. In their fifth cause of action, plaintiffs allege that the GE's misappropriation of their technology and know-how constituted a taking of plaintiffs' property in violation of international law.[2] The complaint seeks (1) compensatory damages in the amount of $510,000; (2) an award of lost profits in the amount of $4,800,000; and (3) an accounting by UG for the profits earned by it and its statutory predecessor GE through the technology and know-how that GE allegedly misappropriated from plaintiffs.

Soon after the complaint was filed, all three defendants moved to dismiss. The Republic of Ireland, which was named as a defendant on the theory that it was the "employer" of GE and IDA, moved for summary judgment on the ground that it could not, under the facts of this case, be held responsible for the acts of GE and IDA. Defendants UG and IDA moved to dismiss pursuant to (1) Rule 12(b)(1), Fed.R.Civ.P., alleging lack of subject matter jurisdiction; (2) Rule 12(b)(2), Fed.R.Civ.P., alleging lack of personal jurisdiction; (3) Rule 9(b), Fed.

---

**2.** Plaintiffs' fifth cause of action is capable of being construed as attempting to state a claim for a taking in violation of international law against IDA as well as GE. To the extent it was intended in this fashion, plaintiffs' fifth cause of action is hereby dismissed as to IDA because the complaint nowhere alleges any taking whatsoever by IDA.

R.Civ.P., alleging a failure to plead fraud with particularity, and (4) the doctrine of *forum non conveniens.* On February 10, 1982, Judge Gesell issued a memorandum decision wherein he held that the Republic of Ireland could not, on the facts of this case, be held liable for the conduct of its instrumentalities GE and IDA. *Gibbons v. Republic of Ireland,* 532 F.Supp. 668, 672 (D.D.C.1982). Judge Gesell accordingly granted the Republic of Ireland's motion for summary judgment and ordered that the complaint be dismissed as to that defendant. The elimination of the Republic of Ireland as a named defendant rendered venue improper in the United States District Court for the District of Columbia, *see* 28 U.S.C. § 1391(f)(4). Thus, Judge Gesell ordered that the action be transferred to this Court, on the ground that "[t]he great bulk of the activities giving rise to this action which occurred in the United States took place in New York City." *Gibbons v. Republic of Ireland, supra,* 532 F.Supp. at 673; *see* 28 U.S.C. § 1406(a). As a result of this order, Judge Gesell never ruled on the UG–IDA motion to dismiss. Upon being transferred to this Court, the action was assigned to me. Shortly thereafter, UG and IDA renewed their motion to dismiss. The Court heard oral argument on the motion on June 25, 1982, and reserved decision in order to permit the parties to make certain additional submissions to the Court. These submissions were completed by July 30, 1982, setting the stage for the decision that the Court renders by today's opinion.

## DISCUSSION

The Court has determined to consider the merits of the UG–IDA motion to dismiss in the following order. First, the Court discusses the UG–IDA contention that the Court lacks subject matter jurisdiction over this action. Second, the Court analyzes the issue of whether it has personal jurisdiction over UG and IDA. Third, the Court turns to the question whether the doctrine of *forum non conveniens* should be invoked here. Fourth, the Court considers the UG–IDA argument that plaintiffs' complaint fails to plead fraud with the particularity required by Rule 9(b), Fed.R.Civ.P.

## I

Defendants' challenge to the Court's subject matter jurisdiction over this action rests on alternative theories. First, defendants contend that there is no statutory basis for an assertion of original federal jurisdiction over this action. Second, defendants argue that a subject-matter-jurisdiction dismissal is required here, even if this action is found to fall within the statutory original jurisdiction of the federal courts, because any congressional grant of original subject matter jurisdiction over an action such as this exceeds the limits on the federal judicial power set forth in Article III of the Constitution. The Court begins its analysis of the subject matter jurisdiction branch of the UG–IDA motion by considering defendants' statutory argument, and then turns to the question of whether the Constitution precludes the Congress from authorizing a federal court to adjudicate an action of this variety.

## A

Plaintiffs concede that both UG and IDA, being instrumentalities of the Republic of Ireland, have the status of a "foreign state," as that term is defined in 28 U.S.C. § 1603(a). Thus, the question of the Court's statutory subject matter jurisdiction over this action must be answered by reference to the Foreign Sovereign Immunities Act of 1976 ("the FSIA"), Pub.L. No. 94–583, 90 Stat. 2891 (1976), a six-year-old statutory labyrinth that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary. In theory, the FSIA provides a federal judge with a statutory answer to any and all procedural questions that might arise in the context of a civil action against a foreign state, including the three crucial questions of (1) the availability of sovereign immunity as a defense, (2) the presence of subject matter jurisdiction over

the claim, and (3) the existence of personal jurisdiction over the defendant. However, the manner in which the FSIA deals with these three questions is remarkably obtuse. Personal jurisdiction over a defendant foreign state hinges not on the foreign state's contacts with the United States, but rather on whether the court has subject matter jurisdiction over the claim.[3] Subject matter jurisdiction over the claim does not depend on such traditional indicia as the citizenship of the parties or the substantive law under which the claim arises, but turns merely on whether the defendant foreign state is entitled to raise the procedural defense of sovereign immunity. The availability of sovereign immunity as a defense requires consideration of a laundry list of purposefully ambiguous "exceptions," several of which were apparently drafted without any regard for the jurisdictional consequences that would flow, or would purport to flow, from their applicability, and all of which present interpretive problems of varying degrees of difficulty. Practically speaking, then, the FSIA did little more than produce a statutory skeleton from which the federal judiciary has been left to create, through a case-by-case decisional process, a fully developed body of sovereign immunity law. *See Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 94th Cong., 2d Sess. 53 (1976) (testimony of Monroe Leigh, Legal Adviser, Department of State) (stating that the drafters of the FSIA, having "decided to put [their] faith in the U.S. courts," attempted to provide only "very modest guidance" to the courts on many issues raised by the FSIA). Therefore, while the language of the FSIA certainly is the starting point for analysis of any procedural question raised in an action against a foreign state, it is often little more than that; in most cases, decisions must be arrived at through a great reliance on the general congressional purposes that led to the enactment of the FSIA.

With the foregoing introduction in mind, the Court turns to the issue at hand, namely, defendants' argument that this action is not one over which the FSIA confers original federal subject matter jurisdiction. As noted, subject matter jurisdiction under the FSIA turns on whether the defendant foreign state is entitled to raise sovereign immunity as a defense. Under the FSIA, an entity having the status of a foreign state is entitled to a presumption of immunity, *see* 28 U.S.C. § 1604, which presumption can be rebutted if the plaintiff shows that an exception to the general rule of immunity is available. Thus, the FSIA gives a federal district court "original jurisdiction without regard to amount in controversy of *any* nonjury civil action against a foreign state as defined in [28 U.S.C. § 1603(a)] as to *any* claim for relief in personam with respect to which the foreign state is not entitled to immunity either under [28 U.S.C. §§ 1605–07] or under any applicable international agreement." 28 U.S.C. § 1330(a) (emphasis added). Here, then, the UG–IDA motion to dismiss for lack of subject matter jurisdiction must be granted unless plaintiffs can locate an applicable exception to the defense of sovereign immunity either in the FSIA or in a prevailing international agreement.

Plaintiffs rely on three separate exceptions to the defense of sovereign immunity in arguing that the Court has subject matter jurisdiction over this action. First, plaintiffs contend that all five causes of action set forth in the complaint fall within the "commercial activity exception" to the sovereign immunity defense codified in 28 U.S.C. § 1605(a)(2). Second, plaintiffs argue that the complaint's fifth cause of action also falls within 28 U.S.C. § 1605(a)(3), which denies immunity to a foreign state, and hence affords a federal

---

**3.** As the Court discusses in part II of today's opinion, personal jurisdiction under the FSIA also depends on proper service having been made on the defendant foreign state. This is scarcely an onerous requirement where, as here, the defendant is an agency or instrumentality of a foreign state; nothing more is required than that a translated copy of the complaint be mailed, return receipt requested, to the agency or instrumentality sought to be served. 28 U.S.C. § 1608(b)(3)(B).

district court subject matter jurisdiction over an action against that foreign state, in certain cases where "rights in property taken in violation of international law are in issue." Third, plaintiffs contend that the "waiver exception" to the sovereign immunity defense, *see* 28 U.S.C. § 1605(a)(1), applies to all five claims in this case, on the theory that the Republic of Ireland has, pursuant to an international agreement

**4.** The second of the three exceptions relied upon by plaintiffs, which is codified in 28 U.S.C. § 1605(a)(3), is available when (1) a foreign state is a named defendant in a cause of action where "rights in property taken in violation of international law are in issue," and (2) either (a) "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (b) "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." Defendants contend that the first prong of § 1605(a)(3) has not been satisfied here because the facts set forth in the complaint do not state a claim for a taking in violation of international law. While this argument would have been more aptly raised in a Rule 12(b)(6) motion to dismiss the fifth cause of action for failure to state a claim, there is precedent for a Rule 12(b)(1) dismissal of a cause of action where the cause of action fails to allege a substantial federal claim. 13 C. Wright & A. Miller, *Federal Practice and Procedure* § 3564 (1975); *see, e.g., Hagans v. Lavine,* 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974). Such dismissals should, however, be confined to claims that are so plainly insubstantial on their face as to be devoid of any merit, thus permitting a conclusion that they are patently frivolous or wholly insubstantial. *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776–777, 90 L.Ed. 939 (1946); *Giulini v. Blessing,* 654 F.2d 189, 192 (2d Cir. 1981). Thus, it is not controlling that plaintiffs have failed to allege the elements of a taking in violation of international law (*i.e.,* a taking that was either arbitrary, discriminatory, or without proper compensation). Rather, a Rule 12(b)(1) dismissal of the fifth cause of action is only appropriate if the Court can conclude from the face of the complaint that it is "patently frivolous" for plaintiffs to claim that a violation of international law resulted from GE's alleged misappropriation of their technology and know-how. While it may well be that this alleged misappropriation does not rise beyond the level of an ordinary "commercial violation" to a violation of international law, *see Verlin-*

with the United States, waived the right of its instrumentalities such as UG and IDA to raise the sovereign immunity defense before the United States courts. For the reasons that follow, the Court concludes that the first of these three exceptions, the so-called "commercial activity exception," provides a sufficient basis for statutory subject matter jurisdiction over all five causes of action.[4]

*den B.V. v. Central Bank of Nigeria.* 647 F.2d 320, 325 n. 16 (2d Cir.1981), *cert. granted,* 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), the Court cannot presently say that plaintiffs' claim that it does is "devoid of any merit." Turning to the second prong of § 1605(a)(3), it is plain that the technology and know-how that was allegedly taken in violation of international law is not now "present" in the United States. As noted, however, § 1605(a)(3) permits an agency or instrumentality such as GE to be sued for a taking in violation of international law, even where the property taken is not present in the United States, if that property is owned or operated by the defendant agency or instrumentality and the defendant is engaged in a commercial activity in the United States. Here, GE is the alleged owner of the property in question and, for the reasons set forth in text *infra,* is engaged in a commercial activity in the United States within the meaning of the FSIA. Thus, both prongs of the text for the applicability of the § 1605(a)(3) exception are satisfied as to the fifth cause of action.

The third exception relied upon by plaintiffs, the so-called "waiver exception," 28 U.S.C. § 1605(a)(1), is available whenever "the foreign state has waived its immunity either explicitly or by implication." As noted, plaintiffs contend that the Republic of Ireland has, pursuant to an international agreement with the United States, waived the right of its instrumentalities such as UG and IDA to raise the sovereign immunity defense before the United States courts. The treaty provision relied upon by plaintiffs reads as follows:

No enterprise of either Party which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Treaty of Friendship, Commerce and Navigation (hereinafter "the Friendship Treaty"), Sept. 14, 1950, United States-Ireland, art. XV(3), 1 U.S.T. 785, T.I.A.S. No. 2155. While this provision is undoubtedly a "waiver" of immunity within the meaning of § 1605(a)(1),

■ The commercial activity exception to the sovereign immunity defense is codified in 28 U.S.C. § 1605(a)(2), which reads as follows:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . .

(2) in which the action is based ["clause 1"] upon a commercial activity carried on in the United States by the foreign state; or ["clause 2"] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or ["clause 3"] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Thus, the commercial activity exception to the sovereign immunity defense is only available with respect to a particular cause of action where (1) the cause of action is "based upon" an act performed "in connection with" conduct that qualifies as "commercial activity,"[5] and (2) the act sued

it does not waive the right of *every* agency or instrumentality of the Republic of Ireland to raise the sovereign immunity defense before the United States courts. Rather, it extends only to such agencies and instrumentalities as are (1) engaged in commercial, manufacturing, processing, shipping or other business activities, and (2) perform these activities within the United States. The first prong of this test has not been satisfied with respect to either IDA or UG. Some courts have, in interpreting treaties similar to the Friendship Treaty, referred to the FSIA's test for "commercial activity" in order to decide whether the defendant is engaged in the "commercial" activities contemplated by the treaty's waiver provision. *See, e.g., Behring International, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383, 390 (D.N.J.1979). In this Court's view, however, such an approach ignores the fact that the FSIA, by adopting the "nature-of-the-act test" for determining whether a particular activity is commercial (*see* text *infra*), significantly broadened the method by which the commerciality of a foreign state's activity is determined. *See* Note, *Defenses to Actions Against Foreign States Under the United States Antitrust Laws,* 20 Harv.Int'l L.J. 583, 588–93 (1979). Prior to the enactment of the FSIA, courts determined whether a foreign state's activity was commercial by reference to the *purpose* of that activity, *see Restatement (Second) of the Foreign Relations Law of the United States* § 69 comment a (1965); under this approach, immunity would be allowed where the foreign state's activity was designed to serve an important public purpose, but denied if the purpose of the foreign state's activity was primarily pecuniary. *See Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 360 (2d Cir.1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). While the Court has found no reported pre-FSIA case that interprets a waiver-of-immunity provision similar to the one contained in the Friendship Treaty, it appears that the drafters of such provisions intended that they be interpreted in

accord with the *then-prevailing* method for determining the commerciality of a foreign state's activity. *See* Setser, *The Immunity Waiver for State-Controlled Business Enterprises in United States Commercial Treaties,* [1961] Proc.Am. Soc'y Int'l L. 89, 99. Here, then, since the activities performed by UG and IDA are undertaken for an important governmental purpose (*i.e.,* the development of Ireland's industrial capacity), and in no sense are engaged in for profit or pecuniary gain, the Court holds that neither IDA nor UG are engaged in "commercial" activity within the meaning of the Friendship Treaty's waiver-of-immunity provision.

The Court's conclusion that neither UG nor IDA is engaged in a "commercial" activity within the meaning of the Friendship Treaty's waiver-of-immunity provision does not prevent the Court from applying the FSIA's "commercial activity exception" to hold that it has subject matter jurisdiction over all five of plaintiffs' causes of action. The Court recognizes that the FSIA is, by its terms, "[s]ubject to existing international agreements to which the United States [was] a party at the time of [its] enactment." 28 U.S.C. § 1604. Thus, where there is a manifest conflict between the FSIA and a pre-existing international agreement, the *pre-existing international agreement controls. See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17–18, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6616. However, there is no "manifest conflict" in holding that certain activity is at once insufficient to trigger the waiver exception codified in § 1605(a)(1), but sufficient to make available the commercial activity exception set forth in 28 U.S.C. § 1605(a)(2).

5. Read literally, "clause 1" requires that the cause of action be directly "based upon" the defendant foreign state's commercial activity in the United States, not merely "based upon" an act performed by the defendant "in connection with" that commercial activity. Thus, it is arguable that, where the defendant foreign state has carried on a commercial activity in the United States, clause 1 confers subject matter

upon and the connected commercial activity bear a relation to the United States described by either "clause 1," "clause 2," or "clause 3" of section 1605(a)(2). *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 308. The first of these two inquiries focuses on whether the defendant foreign state was engaged in commercial activity and on the nexus between that commercial activity and the cause of action; the second inquiry considers the relationship that the act sued upon and the connected commercial activity had to the United States.

### 1

In pursuing the first line of inquiry set forth above, the Court begins by identifying the activities that GE and IDA carried on "in connection with" their performance of the particular acts that the causes of action against each are "based upon." Prior judicial decisions provide some helpful definitions of the terms "based upon" and "in connection with" as used in section 1605(a)(2). A cause of action is, for the purposes of the FSIA, "based upon" any act performed by a named defendant that either constituted or directly caused the occurrence of an element of the cause of action. *Gilson v. Republic of Ireland, supra,* 682 F.2d at 1027 n. 22. A single transaction or act can be an "activity" for the purpose of applying section 1605(a)(2)'s "in connection with" requirement, *see* 28 U.S.C. § 1603(d), and that requirement is satisfied if the act sued upon

"related to" an activity carried on by the defendant foreign state. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 308; *see* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 19 (1976), *reprinted in* [1976] U.S.Code Cong. & Ad. News 6604, 6617. Thus, a foreign state's "[b]reach of an agreement is necessarily performed 'in connection with' that agreement," and is accordingly performed "in connection with" an activity carried on by a foreign state. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 311 n. 30.

Here, GE allegedly failed to perform certain contractual obligations, appropriated certain proprietary information, made certain false statements, and discouraged certain potential investors in IPC. IDA allegedly also made certain false statements. Each of these alleged acts "related" either to GE's participation in the Joint Venture Agreement or to IDA's efforts to bring about the conclusion of the Joint Venture Agreement. Further, the performance of these acts by GE and IDA constituted the performance of at least one element of each cause of action set forth in the complaint. As a result, all five causes of action against GE are "based upon" acts that were performed "in connection with" GE's participation in the Joint Venture Agreement; similarly, the single cause of action against IDA is "based upon" an act that was performed "in connection with" IDA's efforts to bring about the conclusion of the Joint Venture Agreement.

jurisdiction over a cause of action based upon an act performed *in the United States* in connection with that activity, but not over a cause of action based upon an act performed *abroad* in connection with that activity. This reading of clause 1 has been specifically rejected by the Court of Appeals for the Third Circuit as contrary to the intent of the framers of the FSIA. *Sugarman v. Aeromexico, Inc.,* 626 F.2d 270, 272–73 (3d Cir.1980). Also, this interpretation has been impliedly rejected by the Court of Appeals for this Circuit in *Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs,* 647 F.2d 317 (2d Cir.1981). There, the Court of Appeals held, under clause 1, that a cause of action is always "based upon" a commercial activity carried on in the United States, regardless of where the particu-

lar act sued upon was performed, if the act sued upon was "part and parcel" of a commercial activity carried on in the United States. *Id.* at 319. On the basis of this holding, the *Gemini Shipping* court relied on clause 1 to find jurisdiction notwithstanding the fact that the particular act sued upon was performed abroad. Accordingly, this Court holds that the applicability of clause 1 does not depend on the locus of the specific act sued upon, but rather on the locus of the commercial activity in connection with which the act sued upon was performed. In other words, where the defendant has performed an act in connection with a commercial activity carried on in the United States, clause 1 confers subject matter jurisdiction over a cause of action based upon that act regardless of where the act occurred.

Thus, the question for the Court's decision is whether GE, by participating in the Joint Venture Agreement, and IDA, by acting to bring about the conclusion of the Joint Venture Agreement, thereby each carried on a "commercial" activity within the meaning of the FSIA. The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the *nature* of the [activity], rather than by reference to its *purpose*." 28 U.S.C. § 1603(d) (emphasis added). Accordingly, if the conduct in question is activity "in which a private person could engage," *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 309, or activity that "an individual might 'customarily carr[y] on for profit,'" *International Association of Machinists v. OPEC,* 649 F.2d 1354, 1357 (9th Cir.1981) (quoting H.R.Rep. No. 1487, *supra,* at 16), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982), that conduct is commercial for purposes of the FSIA even if it was intended to serve the most integral or fundamental governmental objectives.

Applying these principles to the case at hand, the Court concludes that GE's conduct in participating in the Joint Venture Agreement constituted commercial activity within the meaning of the FSIA. Every obligation undertaken by GE in the Joint Venture Agreement contemplated activity in which, by nature, a private party could engage;[6] viewed as a whole, the Joint Venture Agreement was, by nature, precisely the sort of activity that an individual might customarily carry on for profit. Given the "nature-of-the-act test" for commerciality that has been codified in the FSIA, it is of no relevance to the Court's analysis that GE did not enter into the Joint Venture Agreement with the purpose of achieving pecuniary gain. Rather, the controlling factor is that the Joint Venture Agreement is by nature a transaction that could just as easily have been entered into by a private party and could just as easily have been undertaken for a pecuniary rather than a public purpose.

Defendants UG and IDA, which do not seriously contend that GE's activity in participating in the Joint Venture Agreement was non-commercial, vigorously argue the IDA did not engage in commercial activity by its alleged conduct in bringing about the conclusion of the Joint Venture Agreement. The Court rejects this argument. While it may well be, as defendants argue, that IDA exists in order to serve a purpose integral to the Irish government's plans for Ireland's economic development, the promotional activities that IDA generally performs and allegedly engaged in here

---

**6.** The only arguable exception involves the tax incentives that GE told plaintiffs would be available for IPC and for plaintiffs as the proprietors of IPC. Plainly, a private party is not capable of unilaterally amending a prevailing tax statute in order to reduce another party's prospective tax burden. Thus, GE did indeed engage in non-commercial activity if it arranged for plaintiffs to be afforded a special tax advantage under Irish law. However, the complaint alleges that the tax incentives in question were generally available under Irish law, and that GE merely apprised plaintiffs of the existence of these incentives. If, as plaintiffs allege, GE and plaintiffs merely organized their joint venture in order to take advantage of pre-existing tax incentives made available by Irish law, the parties acted no differently in so doing than would joint venturers in a purely private transaction. (For example, a United States entrepreneur would surely not be acting in a non-commercial capacity if, in order to induce an Irish company to join him in a joint venture to be located in the United States, he promised the Irish company that the project would be organized as a Domestic International Sales Corporation. *See* 26 U.S.C. §§ 991–97.) Therefore, accepting plaintiffs' jurisdictional allegations as true, the tax aspect of the Joint Venture Agreement did not alter the purely commercial nature of GE's participation in the Joint Venture Agreement. The Court thus need not decide the difficult question of the jurisdictional result that would flow from a mixed commercial/non-commercial activity such as would have existed here if GE, instead of being merely an entity designed to enable potential investors to take advantage of certain favorable Irish tax laws, had been given its own de facto law-making power in order to offer prospective investors special tax incentives as part of GE's contribution to a joint venture.

are, *by nature,* no different at all from the promotional activities engaged by a private public relations firm. Just as a private public relations firm might refer a prospective customer to its principal and might lend its principal the use of its offices or its personnel for the purpose of facilitating the principal's efforts to reach an agreement with the prospective customer, so here IDA allegedly referred plaintiffs to GE and then gave plaintiffs and GE use of its New York City office and its personnel for the purpose of facilitating their efforts to reach an agreement. Thus, IDA's conduct in bringing about the conclusion of the Joint Venture Agreement was just as commercial *in nature* as GE's conduct in participating in the Joint Agreement. As a result, plaintiffs' claims against GE and IDA are all based upon acts that were performed in connection with a "commercial" activity carried on either by GE or IDA, meaning that the first prong for the test of the availability of the commercial activity exception is satisfied with respect to all five causes of action set forth in the complaint.[7]

### 2

Having determined that all five of plaintiffs' causes of action are based upon acts performed by GE and IDA in connection with conduct that qualifies as commercial activity, the Court turns to the second prong of the test for the availability of the commercial activity exception and considers whether the acts here sued upon and the commercial activity connected with those acts bear a relationship to the United States specified by either clause 1, clause 2, or clause 3 of section 1605(a)(2). On its surface, this stage of the Court's analysis is quite straightforward. Section 1605(a)(2) requires a court merely to determine the locus of the act sued upon and of the connected commercial activity, and then to refer to the appropriate clause. This decisional process and the possible results that can be obtained thereby in any given case are illustrated by the following chart:

7. The Court recognizes that this holding is apparently anomalous insofar as it concerns plaintiffs' fifth cause of action, which alleges a taking by GE in violation of international law. Plainly, since a private party cannot, by definition, commit a violation of international law, a "taking in violation of international law" is not an act that a private party can perform and hence is not a "commercial" act within the meaning of the commercial activity exception. It thus may, at first glance, appear to be incorrect for the Court to hold that the commercial activity exception confers subject matter jurisdiction over a cause of action based upon an alleged taking in violation of international law. Given the fact that the court plainly has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1605(a)(3), *see* note 4 *supra,* it is somewhat academic whether the Court also has subject matter jurisdiction over this cause of action pursuant to the commercial activity exception. However, a brief exposition of the reasons for the Court's latter holding is appropriate. By its terms, the commercial activity exception requires only that the act sued upon be performed *in connection with* a commercial activity; it does not further require that the act sued upon *itself* be commercial. While there are numerous occasions where the courts are well advised to look beyond the literal wording of the FSIA, *see, e.g.,* note 5 *supra,* the Court does not regard this to be an appropriate instance in which to do so. The FSIA certainly contemplates that the courts will hear *some* claims against foreign states based on alleged takings in violation of international law. Most prominently, 28 U.S.C. § 1605(a)(3) empowers federal courts to hear such claims when the property that was taken by the defendant is either (1) present in the United States in connection with a commercial activity carried on by the defendant or one of its agencies and instrumentalities, or (2) owned or operated by a defendant agency or instrumentality engaged in a commercial activity in the United States. Given the clear congressional intention to permit the courts to hear cases based on takings in violation of international law when the property taken is owned or operated by the defendant in connection with a commercial activity carried on in the United States, the Court does not believe that it undermines the intent of the Congress in enacting the FSIA by interpreting the FSIA, in accordance with its plain language, to permit the courts to hear such actions when the taking itself was performed in connection with a commercial activity carried on in the United States. Nor does the Court's interpretation of § 1605(a)(2) render § 1605(a)(3) redundant, because § 1605(a)(3) covers a broad spectrum of cases where the actual taking was not, as required by § 1605(a)(2), performed in connection with a commercial activity carried on by the defendant.

LOCUS OF CONNECTED
COMMERCIAL ACTIVITY

| | | Connected commercial activity carried on in United States | Connected commercial activity carried on abroad |
|---|---|---|---|
| LOCUS OF ACT SUED UPON | Cause of action based upon act performed in United States | "CLAUSE 1" CONFERS SUBJECT MATTER JURISDICTION | "CLAUSE 2" CONFERS SUBJECT MATTER JURISDICTION |
| | Cause of action based upon act performed abroad | "CLAUSE 1" CONFERS SUBJECT MATTER JURISDICTION | "CLAUSE 3" CONFERS SUBJECT MATTER JURISDICTION IF ACT SUED UPON CAUSED DIRECT EFFECT IN UNITED STATES |

However, the apparent simplicity of section 1605(a)(2) is most deceptive. Great difficulty often inheres in determining the locus of the act sued upon. For example, a fraudulent misrepresentation communicated by telex from Ireland to the United States is an act that arguably was performed in Ireland, or in the United States, or in both jurisdictions. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 311 n. 30. Even more difficult problems arise when a court attempts to determine the locus of the commercial activity carried on by the foreign state in connection with the act upon which the lawsuit is based. The acuteness of the problems that arise in making this latter determination is magnified by the importance of the consequences that flow when a court concludes that a particular commercial activity was or was not carried on in the United States. As may be seen from the chart set forth above, clause 1 *always* confers jurisdiction, regardless of where the act sued upon was performed, if the connected commercial activity was carried on in the United States. *See* note 5 *supra.* On the other hand, where the connected commercial activity was carried on abroad, subject matter jurisdiction depends on a finding that the act sued upon was either performed in the United States or caused a direct effect in the United States.

Accordingly, since the need to determine the locus of the act sued upon is eliminated by a determination that the commercial activity carried on in connection with that act was located in the United States, a good starting point for the Court's analysis is to determine the locus of the commercial activity at issue here, to wit, GE's conduct in participating in the Joint Venture Agreement and IDA's conduct in bringing about the conclusion of the Joint Venture Agreement. Fortunately, this is an area in which both the FSIA itself and the cases decided under it provide a great measure of assistance. The FSIA states that a commercial activity is carried on in the United States if it has "substantial contact with the United States." 28 U.S.C. § 1603(e). Thus, a foreign state's commercial activity may be "carried on" in several jurisdictions simultaneously if that activity has a substantial contact with each. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 311 n.30. Moreover, the United States activities of an agent of the defendant foreign state are attributed to the defendant foreign state for the purpose of determining whether its

commercial activity had a substantial contact with, and hence was "carried on" in, the United States. *East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383, 390 (S.D.N.Y.), *aff'd mem.,* 610 F.2d 806 (2d Cir.1979). Where, as here, the commercial activity in question centers on the formation of a contract, the United States will be found to have had a substantial contact with that activity if substantial contractual negotiations occurred here, *see Maritime International Nominees Establishment v. Republic of Guinea,* 505 F.Supp. 141, 143 (D.D.C.1981), or if substantial aspects of the contract were to be performed here, *see Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs,* 647 F.2d 317, 319 (2d Cir.1981). In short, the jurisdiction conferred on the federal district courts by virtue of clause 1 and its phrase "commercial activity carried on in the United States" is at least as broad as the jurisdiction conferred on a state court by virtue of a state long-arm provision that permits the exercise of jurisdiction where the cause of action arises from the defendant's "transacting business" within the state or "contracting to supply goods or services" within the state. *In re Rio Grande Transport, Inc.,* 516 F.Supp. 1155, 1162 (S.D.N.Y.1981); *see* H.R.Rep. No. 1487, *supra,* at 13 (stating that section 1605(a)(2) is modeled on the District of Columbia's long-arm statute, D.C.Code § 13–423(a), which in relevant part permits the exercise of jurisdiction as to any claim arising from the defendant's "transacting any business" or "contracting to supply services" in the

District of Columbia). *See also* N.Y.Civ. Prac.Law § 302(a)(1) (permitting exercise of jurisdiction as to any cause of action arising from defendant's conduct in "transact[ing] any business within the state or contract[ing] anywhere to supply goods or services within the state").[8]

Applying the foregoing principles to the facts of the instant case, the Court has little difficulty in concluding that the commercial activity at issue here was "carried on" in the United States. As regards IDA's commercial activity, it suffices to observe that every aspect of its alleged conduct in bringing about the conclusion of the Joint Venture Agreement was performed in the United States. Turning to the commercial activity carried on by GE, the Court believes, for two reasons, that GE's alleged conduct in participating in the Joint Venture Agreement had a sufficient contact with the United States to permit a finding that it was carried on here.

*First,* plaintiffs have alleged that GE's participation in the Joint Venture Agreement resulted from substantial contractual negotiations conducted by GE in the United States. Specifically, plaintiffs contend that GE's promise to give plaintiffs a capital grant of up to sixty percent of the cost of the machinery necessary to equip the County Galway plant, which promise was first negotiated and agreed upon at the October 1974 meeting between plaintiffs and representatives of GE at IDA's New York City office, was the lynchpin of the Joint Venture Agreement and was essential

---

**8.** While Congress clearly intended, in enacting the commercial activity exception, to parallel the typical state long-arm statute, it also clearly intended certain provisions of the commercial activity exception to be broader in their jurisdictional sweep than their counterparts in the state-law model. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 311 (holding that clause 3 of § 1605(a)(2) was intended to have a broader reach than its counterpart in the District of Columbia and other similar long-arm statutes, and thereupon declining to rely on practice under such statutes in interpreting scope of clause 3). Thus, the Court recognizes that analogies between the jurisdictional scope of state long-arm statutes and that of the FSIA's

commercial activity exception must be drawn with great care. Accordingly, while the legislative history of clause 1 leaves little doubt that the jurisdictional sweep of clause 1 is at least as broad as that of analogously worded state statutes, *see* H.R.Rep. No. 1487, *supra,* at 17 (stating that clause 1 covers, *inter alia,* cases based on "commercial transactions performed in whole or in part in the United States" and "import-export transactions involving sales to, or purchases from, concerns in the United States"), the Court stops short of holding by today's opinion that clause 1 has a jurisdictional reach that is identical in all respects to the jurisdictional reach of the analogous provision contained in the long-arm statutes of the District of Columbia and most states.

to the continuation of the parties' negotiations.[9] In cases where the contractual negotiations within the jurisdiction "substantially advanced" or were "substantively important" or "essential" to the formation of the contract, the courts do not hesitate to find jurisdiction under state long-arm statutes that authorize jurisdiction to be exercised if the defendant "transacted business" within the jurisdiction. *See, e.g., Bialek v. Racal-Milgo, Inc., supra,* 545 F.Supp. at 34–35. By analogy, courts interpreting the FSIA's grant of jurisdiction over cases where the defendant "carried on [a commercial activity] in the United States" should not hesitate to find jurisdiction where such significant contractual negotia-

tions occurred within the United States. Thus, since the United States-based negotiations between GE and plaintiffs were allegedly "essential" to the formation of the Joint Venture Agreement, these negotiations by themselves permit a conclusion that GE carried on a commercial activity in the United States by its participation in the Joint Venture Agreement.[10]

*Second,* plaintiffs have alleged that GE's participation in the Joint Venture Agreement was conditioned on plaintiffs' promise to perform a substantial part of the contract in the United States. To explain, plaintiffs claim that the Joint Venture Agreement not only required plaintiffs

**9.** The Court declines defendants' invitation to place heavy emphasis on the "fact" that the Joint Venture Agreement was "executed" in Ireland. To begin with, the Court observes that, while the October 17, 1975 agreement was apparently signed by plaintiffs in Ireland, that agreement was amended by an agreement signed by plaintiffs in the United States on June 12, 1976. Since the amendatory agreement was, according to the complaint, both *essential to the commencement of the project* and contemplated at the time plaintiffs signed the original agreement, it is at least questionable whether the "execution" of the Joint Venture Agreement really should be placed in Ireland. In any event, the courts have, in applying state long-arm provisions analogous to clause 1, consistently rejected the proposition that the place of a contract's execution is determinative of jurisdiction, *see, e.g., Harry Winston, Inc. v. Waldfogel,* 292 F.Supp. 473, 478 (S.D.N.Y.1968) (execution of contract outside state does not necessarily preclude exercise of jurisdiction); *Rene Boas & Associates v. Vernier,* 22 A.D.2d 561, 563, 257 N.Y.S.2d 487, 489–90 (1st Dep't 1965) (execution of contract within state does not necessarily require exercise of jurisdiction), and the drafters of the FSIA clearly did not intend that clause 1 be confined in this manner, *see* H.R.Rep. No. 1487, *supra,* at 17, U.S.Code Cong. & Admin.News at 6615 (stating that clause 1 covers "an indebtedness incurred by a foreign state which negotiates *or* executes a loan agreement in the United States") (emphasis added).

**10.** Even if the United States-based negotiations between GE and plaintiffs were by themselves *insufficiently "substantial"* to permit a conclusion that GE carried on its commercial activity in the United States, the Court would still reach such a conclusion on the basis of the role played by IDA in facilitating the negotiations. Plaintiffs allege that GE had a relationship with

IDA whereby IDA, with GE's knowledge and under some degree of GE's control, acted in the United States for GE's benefit by referring potential projects to GE and by allowing GE use of its New York City office in order to conduct negotiations with potential United States investors. Further, plaintiffs contend that the GE–IDA relationship was essential to GE's participation in the Joint Venture Agreement, since it was only by virtue of its relationship with IDA that GE learned of plaintiffs' proposed project and was able to conduct negotiations with plaintiffs relative to that project. Where, as allegedly occurred here, a person or entity acts within the jurisdiction for the defendant's benefit, and does so with the defendant's knowledge and under some degree of control by the defendant, the courts consistently apply state long-arm statutes by (1) finding, notwithstanding the absence of the formal legal trappings of an agency relationship, that the person or entity acting within the jurisdiction was the defendant's "agent" for jurisdictional purposes, and (2) thereupon imputing the agent's conduct within the jurisdiction to the defendant. *See, e.g., Selman v. Harvard Medical School,* 494 F.Supp. 603, 611 (S.D.N.Y.), *aff'd mem.,* 636 F.2d 1204 (2d Cir.1980); *Plaza Realty Investors v. Bailey,* 484 F.Supp. 335, 347 (S.D.N.Y.1979). Courts applying the FSIA should, in this Court's view, follow the same approach in determining whether a foreign state's commercial activity was carried on in the United States. While the Court need not do so here in light of the substantiality of GE's own contacts with the United States, there would plainly be no possible basis on which to contend that GE's participation in the Joint Venture Agreement was not an activity "carried on" in the United States if the Court were to couple IDA's United States-based efforts to bring about the Joint Venture Agreement with GE's own negotiations in the United States.

themselves to move to Ireland to provide services to IPC, but also required plaintiffs to purchase hundreds of thousands of dollars worth of machinery in the United States for delivery to IPC. The House Report to the bill that became the FSIA lists "import-export transactions involving sales to, or purchases from, concerns in the United States" as being among the paradigmatic examples of commercial activities that should be found to have been "carried on in the United States." H.R.Rep. No. 1487, *supra,* at 17, U.S.Code Cong. & Admin.News at 6615. The Joint Venture Agreement is really nothing more than an export transaction whereby GE agreed to purchase goods (to be acquired by plaintiffs) and services (to be provided by plaintiffs) for delivery in Ireland, and as such falls squarely within the class of cases that, as evidenced by the House Report, Congress intended to cover by clause 1.

For the foregoing reasons, then, the Court finds that the United States is the locus of the commercial activity carried on by GE and IDA in connection with the acts that defendants are being sued upon in this lawsuit.[11] The second prong of the test for the availability of the commercial activity exception has accordingly been satisfied, pursuant to clause 1, with respect to each of plaintiffs' five causes of action. Since the first prong of that test has been satisfied as well, the Court finds that it has subject matter jurisdiction under the FSIA over all five of plaintiffs' causes of action.

### B

Having concluded that it has subject matter jurisdiction under the FSIA over all five causes of action set forth in the complaint, the Court now turns to defendants' contention that there is no constitutional basis for a federal court to be given subject matter jurisdiction over a case of this variety. Defendants' argument that the Constitution does not permit a congressional grant of subject matter jurisdiction over this type of action is predicated on the decision rendered by the Court of Appeals for this Circuit in *Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320 (2d Cir.1981), *cert. granted,* 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). In *Verlinden,* the Court of Appeals held that the Congress is powerless to give an Article III court subject matter jurisdiction over a claim brought by an alien against a foreign state for breach of an agreement not governed by federal law. *Id.* at 322. In reaching this conclusion, the *Verlinden* court began by considering Article III's "diversity clause," which extends the judicial power to controversies "between a State, [or] the Citizens thereof, and foreign States, Citizens or Subjects." *Id.* at 325 (quoting U.S.Const. art. III, § 2, cl. 1). Observing that the diversity clause nowhere mentions a case solely between two aliens, the court rejected the plaintiff's argument that that portion of Article III provided a constitutional basis for a grant

11. The Court's finding that the commercial activity exception confers subject matter jurisdiction over all five of plaintiffs' causes of action is by no means entirely dependent on its conclusion that the United States was the locus of the commercial activity carried on by GE in connection with the acts upon which it is here being sued. Even if the Court had determined that this activity was carried on entirely abroad, subject matter jurisdiction would still have existed pursuant to clause 2. As will be seen from the chart set forth in the text *supra,* the availability of clause 2 with respect to a particular cause of action depends simply on a finding that the cause of action is "based upon" an act performed in the United States. The Court of Appeals for the District of Columbia Circuit has held that, for the purposes of applying clause 2, a cause of action is "based upon" not only those acts performed by the defendant that constitute an element of the cause of action, but also any act performed by the defendant that stands in a direct causal relationship to such acts. *Gilson v. Republic of Ireland, supra,* 682 F.2d at 1027 n. 22. Here, plaintiffs have alleged a direct causal relationship between GE's statements to plaintiffs at the New York City meeting and GE's later acts of misrepresentation, misappropriation, breach of contract, tortious interference with contract, and taking property in violation of international law. Applying the reasoning of *Gilson,* then, plaintiffs' five causes of action are based not only upon GE's later acts, but also upon GE's earlier statements. Since these statements were made in the United States, they would provide a basis under clause 2 for subject matter jurisdiction over all five causes of action even if GE had not carried on the commercial activity in question in the United States.

of federal subject matter jurisdiction over the case at bar. 647 F.2d at 325. The court accordingly turned to Article III's "arising under clause," which extends the judicial power to cases "arising under . . . the Laws of the United States." After an exhaustive review of the cases decided under the arising under clause, the court held that this clause only comprehends cases that necessitate interpretation of a federal *substantive* law. *Id.* at 329 n. 24. Noting that the plaintiff's complaint had not set forth any federal claim, and that the defendant had not relied on any substantive federal defense, but only on the procedural defense made available by the FSIA, the court concluded that the case before it could not be fit within the arising under clause.

▆▆▆▆ The instant action differs in almost every salient respect from the case that confronted the *Verlinden* court. *First,* unlike *Verlinden,* the complaint filed by plaintiffs in this action does set forth a claim that falls within Article III's arising under clause, to wit, plaintiffs' cause of action for a taking in violation of international law. *See Filartiga v. Pena-Irala,* 630 F.2d 876, 885 (2d Cir.1980) (holding that a claim based on an alleged violation of international law falls within the arising under clause because the law of nations "has always been part of the federal common law"). Thus, the congressional grant of subject matter jurisdiction over plaintiffs' fifth cause of action is authorized by the arising under clause, and the congressional grant of subject matter jurisdiction over the remaining four causes of action is authorized by the principles of pendent jurisdiction. *Second,* unlike *Verlinden,* the parties to this action are not all aliens, but

concededly include at least one individual (plaintiff Beiseigel) who, as a United States citizen and a domiciliary of Pennsylvania, unquestionably qualifies as a "Citizen of a State" within the meaning of Article III's diversity clause.[12] Thus, while this action may not have the "complete diversity" between the parties that, prior to the FSIA, was *statutorily* required for a federal court to have subject matter jurisdiction over an action against a foreign state arising under state or foreign law, *see IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975), it does have the "minimal diversity" that is *constitutionally* sufficient, *see State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 531, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967), to support a congressional grant of federal subject matter jurisdiction over such an action. *Accord, Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 81 Civ. 7624 (CBM) (S.D.N.Y. Dec. 18, 1981). The Court therefore rejects defendants' argument that there is no constitutional basis for the Congress to grant this Court subject matter jurisdiction over this action. Having previously disposed of plaintiffs' statutory subject matter jurisdiction argument, the Court denies plaintiffs' motion to dismiss insofar as it relies on Rule 12(b)(1), and turns to defendants' remaining arguments.

## II

Defendants' second principal argument in support of their motion to dismiss is that the Court lacks personal jurisdiction over UG and IDA. The statutory aspects of the Court's analysis of defendants' personal jurisdiction argument are controlled by the FSIA. Under 28 U.S.C. § 1330(b), a federal district court has personal jurisdiction over a foreign state with respect to any cause of

---

**12.** Under the diversity statute, which mirrors Article III's diversity clause, a person is a "citizen of a state" if he or she is (1) a citizen of the United States and (2) a domiciliary of a state of the United States. *Kaufman & Broad, Inc. v. Gootrad,* 397 F.Supp. 1054, 1055 (S.D.N.Y. 1975); *see* 28 U.S.C. § 1332. Defendants contend that this rule is of constitutional dimension and, pointing out that plaintiff Gibbons is presently domiciled in Ireland, argue that he is not a "Citizen of a State" within the meaning of Article III's diversity clause. Given the

Court's conclusion in text that its statutory subject matter jurisdiction over this action is constitutionally authorized regardless of whether Gibbons is a "Citizen of a State" within the meaning of Article III's diversity clause, this constitutional issue need not be decided here. *Compare Mohr v. Allen,* 407 F.Supp. 483, 487 (S.D.N.Y.1976) (dictum that interpretation of 28 U.S.C. § 1332 set out above is of constitutional dimension) *with Sadat v. Mertes,* 615 F.2d 1176, 1189 (7th Cir.1980) (expressly leaving constitutional question open).

action over which the court has subject matter jurisdiction pursuant to the FSIA, as long as service has been made pursuant to 28 U.S.C. § 1608. Here, the FSIA grants the Court subject matter jurisdiction over all the causes of action stated against each defendant, *see* part I(A) *supra,* and service has been properly made on both UG and IDA, or at least has not been objected to. Accordingly, statutory personal jurisdiction exists over both UG and IDA. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 313.

The foregoing conclusion does not end the Court's consideration of defendants' personal jurisdiction argument, however, because the Court must still determine whether an exercise of the personal jurisdiction conferred by the FSIA is permissible under the due process clause of the Fifth Amendment. Generally, this stage of the Court's analysis requires it to determine whether defendants have enough contacts with the United States to permit a conclusion that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Four separate inquires guide the Court's application of *International Shoe's* minimum contacts test. Specifically, the Court must examine "the extent to which defendants availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable to them, the inconvenience to defendants of litigating in the United States, and the countervailing interest of the United States in hearing the suit." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 314; *see World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 297, 100 S.Ct. 559, 564, 567, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington, supra,* 326 U.S. at 316, 66 S.Ct. at 158.

Applying the foregoing principles, there can be little doubt that an assertion of personal jurisdiction over IDA would not offend due process. IDA has an office in New York City; moreover, every act upon which IDA is here being sued was performed by IDA in the United States. Thus, IDA has availed itself of the privileges of United States law, could have foreseen litigation in the United States, and should not be unduly inconvenienced by a trial in the United States.

A more difficult question is whether principles of due process would be violated were the Court to exercise personal jurisdiction over UG. In answering this question, the Court is fortunate to have the assistance of the recent decision rendered by the Court of Appeals for the District of Columbia Circuit in *Gilson v. Republic of Ireland, supra.* Among the many issues considered by the *Gilson* court was the constitutionality, on a set of jurisdictional allegations virtually identical to those presented here,[13] of an

13. Indeed, the District of Columbia's summary of the facts alleged by plaintiff Gilson is so strikingly similar to the factual scenario set forth in plaintiffs' complaint here that it bears quotation in full:

Plaintiff James K. Gilson is a mechanical engineer, an American citizen, and a resident of Massachusetts. He alleges that defendants Gaeltarra Eireann ("GE") and Industrial Development Authority of Ireland ("IDA")—both instrumentalities of the government of the Republic of Ireland, organized under Irish law—induced him to enter into a commercial venture for the development of quartz crystals in Ireland, to move himself, his family, equipment, and technology to Ireland, and to reveal to defendants certain proprietary information. The complaint further contends that subsequent to the plaintiff's move to Ireland, defendant GE breached its contract with plaintiff, turned over to defendant Leictron Teoranta ("Leictron" or "LT")—a third Irish corporation now wholly owned by defendant GE—his patent rights and proprietary information, and along with LT converted his equipment to its own use. Plaintiff also alleges interference by GE and LT in his ongoing contractual relations with another

exercise of personal jurisdiction over GE, UG's statutory predecessor. The *Gilson* court concluded, on the basis of both GE's own United States contacts and those of IDA (GE's purported agent for jurisdictional purposes), that GE had availed itself of American law and that litigation in the United States was accordingly foreseeable by GE. 682 F.2d at 1028. Any inconvenience to GE in litigating the suit in the United States was, in the *Gilson* court's view, counterbalanced for due process purposes by the Congress's implicit determination, in enacting the FSIA, that the United States has a powerful interest in making its courts available to hear such suits. *Id.* at 1028–29. On this basis, the *Gilson* court held that plaintiff's allegations, if proven, would be "more than enough" to satisfy the *International Shoe* standard. *Id.* at 1029.

This Court adopts the *Gilson* court's analysis, and, upon applying that analysis to the facts alleged here, reaches a like result. Precisely as was alleged in *Gilson,* plaintiffs have contended here that GE "entered into [a] contract with plaintiff[s] in the United States, using U.S. mails, telephones, and telegraph, with the purpose of enticing plaintiff[s] to come to Ireland, where [their] expertise, [technology], and equipment could be misappropriated." *Id.* at 1028. If anything, GE's alleged contacts with the United States in this case are greater than those alleged in *Gilson,* because here, as apparently was not the case there, GE representatives travelled to the United States and, while here, conducted substantial contractual negotiations with plaintiffs. Here, then, the Court need not rely on IDA's United States activities to conclude that GE, by its participation in the Joint Venture Agreement, availed itself of the protections of American law and thus could

have foreseen litigation in the United States. Like the *Gilson* court, this Court finds that any inconvenience to UG in litigating this suit in the United States is counterbalanced, for the purposes of the *constitutionality* of an exercise of jurisdiction, by the Congress's implicit determination, in enacting the FSIA, that the United States has a powerful interest in having its courts hear lawsuits such as this. On the basis of these conclusions, the Court finds that maintenance of this action in this jurisdiction against this defendant would not offend traditional notions of fair play and substantial justice. Accordingly, the Court holds that *International Shoe's* minimum contacts test is satisfied here as to both UG and IDA. The Court thus rejects defendants' personal jurisdiction argument, denies defendants' motion to dismiss insofar as it relies on Rule 12(b)(2), and proceeds to consider the third of defendants' four grounds for dismissal.

### III

Having lost their argument that the Court is without jurisdiction either to hear this action or to bring the named defendants before it, IDA and UG urge the Court to decline to exercise its jurisdiction by invoking the doctrine of *forum non conveniens.* The standards that generally govern a district judge's application of the doctrine of *forum non conveniens* are not in doubt, having recently been the subject of lengthy elaboration in decisions rendered by the Supreme Court, *see Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the Court of Appeals for the District of Columbia Circuit, *see Pain v. United Technologies Corp.,* 637 F.2d 775 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), and the

---

Irish corporation. Finally, the complaint alleges that "Defendant IDA, acting alone and then jointly with Defendant GE, were agents of the Defendant Republic [of Ireland] at all times pertinent to this complaint," and that the acts by GE, IDA, and LT of which plaintiff complains were performed "within the scope of [their] employment by Defendant Republic." Plaintiff seeks damages in an amount totalling three million dollars, in ad-

dition to an accounting by GE and LT for all revenues inured to them by virtue of their wrongful conduct.
682 F.2d at 1024 (footnote omitted). One need only substitute the phrase "metallized plastic cosmetics containers" for "quartz crystals" and the word "technology" for "patent rights" in the above-quoted passage in order to convert it from a summary of the facts alleged in *Gilson* to a summary of the facts alleged here.

Court of Appeals for this Circuit, sitting *en banc, see Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147 (2d Cir.1980). However, this case raises a predicate question, apparently of first impression, as to whether the *generally* applicable approach to *forum non conveniens* questions set forth in the above-cited cases should be applied where, as here, the defendant has the status of a "foreign state" within the meaning of the FSIA.

Plaintiffs argue that there should be a strong presumption against dismissing an action on *forum non conveniens* grounds where the defendant is a foreign state. In making this argument, plaintiffs rely on the FSIA, though they concede that neither the FSIA itself nor its legislative history specifically mention the doctrine of *forum non conveniens.* Plaintiffs argument is principally founded on the undeniable fact that the FSIA is powerfully informed by a congressional intention to give a person injured in his or her dealings with a foreign state "access to the courts" in order to remedy that injury. H.R.Rep. No. 1487, *supra,* at 6–7; *see Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 312. Other courts have held, *see Gilson v. Republic of Ireland, supra,* 682 F.2d at 1028–29; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 315, and this Court holds by today's opinion, *see* part II *supra,* that this congressional purpose acts as a counterweight to a defendant foreign state's argument, on account of the inconvenience that it would suffer by being forced to litigate before a United States court, that an exercise of personal jurisdiction over the defendant would violate principles of due process. Plaintiffs invite the Court to extend this reasoning and hold that the congressional goal of opening up the United States courts to actions against foreign states should inform not only a court's analysis of whether maintenance of the lawsuit in the United States would be fundamentally unfair to a defendant foreign state, but also whether conducting the litigation here would be unduly inconvenient for a defendant foreign state.

The Court declines this invitation. In the Court's view, the congressional intention to open up the United States courts to actions against foreign states was not based on a belief that a plaintiff who sues a foreign state is particularly deserving of a United States forum, but rather was founded on the proposition that a foreign state ought to be treated like a private party by the courts of law when it acts like a private party in the channels of commerce. H.R. Rep. No. 1487, *supra,* at 14; *see Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* 647 F.2d at 315–16. Thus, the Court sees no reason whatsoever to conclude that the enactment of the FSIA evidences a congressional intention that a foreign state brought before a United States court should have a lesser right to a *forum non conveniens* dismissal than a likesituated private person. On the contrary, the congressional intention that the United States courts treat foreign states like private persons when they act like private persons is best fulfilled in the *forum non conveniens* context by applying *the same* standard in actions against a foreign state as is generally applied in actions against private persons. Accordingly, the Court will resolve defendants' *forum non conveniens* argument by reference to the generally applicable principles governing the *forum non conveniens* doctrine, notwithstanding the fact that all defendants in this action have the status of a foreign state under the FSIA.

The doctrine of *forum non conveniens,* long applied by the state courts, *see* Blair, *The Doctrine of Forum Non Conveniens in Anglo-American Law,* 29 Colum. L.Rev. 1, 2 (1929), and by federal courts sitting in admiralty, *see, e.g., Canada Malting Co. v. Paterson Steamships, Ltd.,* 285 U.S. 413, 419–23, 52 S.Ct. 413, 414–415, 76 L.Ed. 837 (1932), has been firmly established as part of the federal common law at least since 1947, when the Supreme Court handed down the companion cases of *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and *Koster v.*

*Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Historically, the doctrine has authorized a federal district court, upon determining that the defendant would be unduly inconvenienced by being forced to litigate in the forum where the action is pending, to dismiss the action notwithstanding the fact that it has subject matter jurisdiction over the claim and personal jurisdiction over the defendant. *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 507, 67 S.Ct. at 842. Today, several general principles guide a district judge's application of the doctrine of *forum non conveniens.* First, a *forum non conveniens* dismissal is only available if there exists an adequate alternative forum that possesses jurisdiction over the entire action and over all the named defendants. *Pain v. United Technologies Corp., supra,* 637 F.2d at 784. The "adequacy" of the alternative forum for the purposes of applying this rule is not affected by the fact that the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery. *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 261. Second, there is ordinarily a strong presumption in favor of the plaintiff's choice of forum. *Alcoa Steamship Co. v. M/V Nordic Regent, supra,* 654 F.2d at 151. The strength of this presumption is normally greatest where the plaintiff is either a citizen or resident of the United States. *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 265. However, the fact that the plaintiff is a United States citizen or resident is never controlling of a *forum non conveniens* decision, *see id.* at 266 n. 23; *Alcoa Steamship Co. v. M/V Nordic Regent, supra,* 654 F.2d at 159, and may be disregarded entirely in an appropriate case, *see, e.g., Pain v. United Technologies Corp., supra,* 637 F.2d at 797–98 (declining to assign any special weight to the fact that one of the plaintiffs was United States resident where the plaintiff in question was apparently made a party precisely to defeat dismissal on *forum non conveniens* grounds).

■ The task of a district judge in deciding a *forum non conveniens* question is, with the foregoing principles in mind, to compare the inconvenience of litigating the action in the present forum with the inconvenience that would inhere in trying the case in the alternative forum. The courts have identified numerous factors, some of private interest and some of public interest, that aid a district judge in undertaking this analysis. The factors pertaining to the private interests of the litigants include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 258 n. 6 (quoting *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. at 843). The public factors that bear on the question include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 258 n. 6 (quoting *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 509, 67 S.Ct. at 843). The task of weighing these factors against one another according to the manner in which they are implicated by the facts of the case at hand is committed to the sound discretion of the district judge. *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 266; *Pain v. United Technologies Corp., supra,* 637 F.2d at 781; *Alcoa Steamship Co. v. M/V Nordic Regent, supra,* 654 F.2d at 158.

■ Plaintiffs, who are presently engaged in litigation with defendant UG before the Irish courts, do not seriously contest defendants' assertion that an adequate alternative forum possessing jurisdiction over the subject matter of this action and over all the named defendants exists in Ireland. Thus, a *forum non conveniens* dis-

missal is theoretically *possible* here. However, since plaintiffs are both United States citizens, one of whom resides in the United States, their choice of this forum is entitled to a strong presumption of propriety.[14] Therefore, a *forum non conveniens* dismissal of this case is only appropriate if the Court determines that the previously mentioned factors of public and private interest clearly point towards a trial in Ireland. *See Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 265.

The Court first considers the factors of private interest. Plaintiffs argue that they have nearly twenty prospective witnesses who reside in the United States and whose attendance at a trial in Ireland therefore cannot be secured by the mechanism of compulsory process. Similarly, defendants list nearly a score of potential witnesses who, because they live in Ireland and are no longer in defendants' employ, cannot be compelled to attend a trial conducted before this Court. Each side vigorously challenges

the other's assertion as to its need for these witnesses. In the Court's view, however, these arguments amount to little more than a shouting match. If the action remains here, any potential witness who resides in Ireland can be deposed in Ireland. Rule 28(b), Fed.R.Civ.P.[15] The deposition transcript thus obtained can then be used at trial in lieu of the witness's live testimony. Rule 32(a)(3)(B), Fed.R.Civ.P. Similarly, the Irish courts will, where necessary, permit the trial use of depositions taken abroad in lieu of live testimony. Affidavit of Robert B. Davidson, July 30, 1982, at ¶ 19. Thus, the Court sees little possibility that either side will, if forced to litigate in a particular jurisdiction, suffer the injustice of being precluded from presenting relevant evidence to the tribunal hearing the action.

While a trial in Ireland would not work an injustice on plaintiffs, the cost of transporting to Ireland those witnesses willing to

14. Defendants argue that the strength of the presumption afforded plaintiffs' choice of forum should be diminished to account for the fact that plaintiff Gibbons, though a United States citizen, presently resides in Ireland and thus would not himself be inconvenienced if the trial takes place before an Irish court. To be sure, the increased deference that is afforded a United States citizen's choice to sue in a United States court is based on the presumption that the United States is the plaintiff's home and is therefore a convenient place for him or her to go to trial. *Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 266. Thus, it can be powerfully argued that a court should disregard the fact that the plaintiff is a United States citizen unless he or she also resides in the United States. *See Pain v. United Technologies Corp., supra,* 637 F.2d at 797. However, the Supreme Court's most recent case on the subject does not suggest that there is any distinction between the presumption owed a resident citizen's choice of forum and that given to a nonresident citizen's choice, *see Piper Aircraft Co. v. Reyno, supra,* 102 S.Ct. at 265–66, and the Court of Appeals for this Circuit has apparently rejected the possibility of drawing such a distinction, *see Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir.1978) (affording plaintiff's choice of forum greater weight on account of plaintiff's status, by treaty, as a United States citizen, notwithstanding fact that plaintiff resided in Iran); Note, *Federal Courts: Forum Non Conveniens,* 20 Harv.Int'l L.J. 404, 411 & n. 41 (1979). In any event, the Court observes that plaintiff Beiseigel, one of the two

plaintiffs in this case, is indeed a United States resident as well as a United States citizen, meaning that the Court is fully justified in applying the higher standard of deference insofar as he is concerned, even if it is not so justified insofar as plaintiff Gibbons is concerned.

15. Defendants point out that Ireland is not a party to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, May 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, and suggest that they will accordingly be unable even to obtain deposition testimony from their prospective witnesses who reside in Ireland. This argument is belied by the fact that two of the principal witnesses falling in this category (Michael Geary and Liam Coffey) submitted affidavits in support of the jurisdictional branch of defendants' instant motion. Thus, the record as it presently stands indicates that defendants' prospective witnesses are fully willing to cooperate with defendants' efforts to defend this suit. Further, Rule 28(b)(3), Fed.R. Civ.P., permits the Court to use letters rogatory to obtain the assistance of the Irish courts in compelling any recalcitrant witness to submit to a deposition. Given that both defendants herein are instrumentalities of the Republic of Ireland, it strikes the Court as utterly fanciful to suppose that an Irish court would reject a reasonable request for assistance made by this Court at the behest of either UG or IDA.

attend the trial would likely make such a trial more expensive for plaintiffs than a trial in the United States. Conversely, defendants stand to benefit financially if the trial is held in Ireland rather than here. In an absolute sense, the extra costs that would be imposed on plaintiffs by proceeding in Ireland would probably be no greater, indeed, might well be less, than the additional expenses that defendants stand to incur if the action remains here. However, when one considers that plaintiffs in this action are individuals with extremely limited financial resources, and that defendants, as instrumentalities of the Republic of Ireland, have an entire governmental fisc behind them, it becomes clear that, *relatively* speaking, the financial consequences that turn on the Court's resolution of defendants' *forum non conveniens* argument are far greater for plaintiffs than they are for defendants.

The remaining factors of private interest do not seem to the Court to carry any particular significance in this case. Defendants argue that IPC, being an Irish corporation, cannot be impleaded in this action. Even assuming that defendants are correct both as a legal matter and as to their estimation that IPC would raise such a jurisdictional defense, the Court is still unable to attach any significance to this point because defendants have not explained, and the Court has no idea, why they might want to bring IPC into this action as a third-party defendant. Defendants also suggest that the Court might want to inspect either the County Galway plant or the equipment still located therein. In its ten years on the bench, the Court has conducted such an inspection in a commercial dispute on precisely one occasion; the outcome of that adventure leaves the Court extremely dubious that it will ever feel the need or the desire to wander through the County Galway plant or to obtain hands-on experience in the operation of equipment used to metallize plastic cosmetics containers. In sum, the Court finds, on the basis of the relative financial resources of the parties, that the factors of private interest cut, though by no means sharply, in favor of trying this action in the United States.

With this conclusion in mind, the Court turns to the factors of public interest. With respect to "the administrative difficulties flowing from court congestion," the Court first observes that this factor is disfavored in this Circuit. *See Calavo Growers of California v. Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). Moreover, the Court, while it is quite familiar with the problem of court congestion in the United States District Court for the Southern District of New York, has absolutely no knowledge of the extent of this problem in the Irish courts, and thus has no basis for comparing the administrative difficulties that this action stands to impose on this Court with those that it would inflict on the Irish courts were the action to proceed there. Accordingly, the Court declines to assign this factor any weight in striking the *forum non conveniens* balance. Turning to the interest in having localized controversies decided at home, the Court is unable to say that this action, which stems from an international business transaction involving citizens of different countries, is "local" either to the United States or to Ireland. As a result, the Court is unable to give this factor weight either in favor of or opposed to a *forum non conveniens* dismissal. Moving finally to the interest in avoiding an unnecessary application of foreign law, the Court is presently of the view that certain questions in this case are governed by American law (*e.g.,* the question whether plaintiffs properly performed that part of the Joint Venture Agreement that was to be performed in the United States) and that others are controlled by Irish law (*e.g.,* whether GE properly performed that part of the Joint Venture Agreement that was to be performed in Ireland). *See Ingrassia v. Shell Oil Co.,* 394 F.Supp. 875, 881–82 (S.D. N.Y.1975) (under New York choice-of-law principles, law of place of performance normally governs matters pertaining to parties' contractual performance). Thus, the "governing-law factor" provides no basis for an

argument that it would be more convenient for an Irish court, rather than this Court, to conduct the trial of this action, since *any* court that hears the case will be faced with the prospect of applying foreign law. Even if the Court were to accept defendants' vigorous argument that Irish law governs this action in its *entirety*,[16] it would still be faced with this Circuit's well-established rule that the need to apply foreign law is not in itself a sufficient reason to apply the doctrine of *forum non conveniens.* See *Manu International, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 67 (2d Cir.1981). As is apparent from the Court's prior discussion, none of the other relevant factors support the proposition that a trial in Ireland would be more convenient than a trial in the United States. As a result, a *forum non conveniens* dismissal would be out of the question here even if the Court were to agree that the "governing-law factor" cuts strongly in favor of such a dismissal.

▌ For the foregoing reasons, the Court concludes that the "balance of inconveniences" does not clearly point toward a trial of this action in Ireland rather than in the United States; indeed, it does not point in that direction at all. In truth, actions of this variety are hugely inconvenient for everyone associated with them no matter where they are tried. At this point, the Court is firmly convinced that the parties to this litigation, who have been shuttled from one court to another once already, are best convenienced not by being sent off to yet a third jurisdiction, but rather by having their dispute put on a course toward prompt disposition. Accordingly, the Court denies

defendants' motion to dismiss insofar as it relies on the doctrine of *forum non conveniens,* and proceeds to consider the fourth and final argument raised by their motion.

## IV

Whereas the first three arguments raised by defendants' instant motion challenge the sufficiency of the complaint in its entirety, the fourth argument that they proffer therein is directed only toward plaintiffs' third cause of action. This cause of action alleges that GE and IDA made fraudulent misrepresentations, both in the United States and abroad, that induced plaintiffs to enter into the Joint Venture Agreement and accordingly caused plaintiffs to suffer the damages that ensued from their participation in the Joint Venture Agreement. Defendants argue that plaintiffs' fraud cause of action is not pleaded with the particularity required by Rule 9(b), Fed.R. Civ.P. While it is probably of small solace to defendants, given the Court's conclusion that their first three arguments are wide of the mark, the Court accepts defendants' fourth argument and holds that plaintiffs' third cause of action must be dismissed, with leave to replead, on the ground that plaintiffs have not therein pleaded fraud with the requisite particularity.

▌ Rule 9(b), Fed.R.Civ.P., states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, it is not enough for a plaintiff claiming fraud merely to allege all the elements of a fraud cause of action in his complaint.[17] Rather, Rule 9(b) imposes on such a plain-

---

**16.** Defendants' argument in this regard is based primarily on their proposition that the Joint Venture Agreement was executed by plaintiffs in Ireland. This proposition is, as previously noted, *see* note 9 *supra,* by no means free from doubt, because the June 12, 1976 agreement, which really finalized the Joint Venture Agreement, was signed by plaintiffs while they were in the United States. In any event, even assuming that the Joint Venture Agreement can truly be said to have been executed in Ireland, modern choice-of-law principles do not favor the law of the place of execution as the law that governs questions arising from a party's

contractual performance. *See Restatement (Second) of the Conflict of Laws* § 188 comment e (1965).

**17.** In one of the many briefs that they have filed with the Court, defendants argue that plaintiffs not only have failed to plead their fraud claim with the particularity required by Rule 9(b), but also have failed even to state a claim for fraud. This latter argument will not be addressed by the Court in today's opinion, since it is properly raised in the context of a motion to dismiss pursuant to Rule 12(b)(6), not a motion to dismiss pursuant to Rule 9(b).

tiff a duty to make certain additional allegations. Specifically, a plaintiff claiming fraud must allege facts stating the time, place, and nature of the misrepresentations or omissions for which each defendant is to be held responsible. *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd mem.,* 697 F.2d 296 (2d Cir.1982); *Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1232 (S.D.N.Y.1981). Further, such a plaintiff must allege some facts from which an inference of scienter can be drawn. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *SEC v. Cayman Islands Reinsurance Corp.,* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,717, at 93,593 (S.D.N.Y. June 17, 1982).

■ Plaintiffs have failed to satisfy the first prong of this test. The "place" of defendants' alleged misrepresentations is adequately identified as having been (1) the New York City meeting between plaintiffs and defendants' representatives and (2) the two proposals sent to plaintiffs by GE and executed by plaintiffs in order to form what is herein referred to as the Joint Venture Agreement. The "time" of the New York City meeting and of the two GE proposals is adequately pleaded as well. However, the "nature" of the misrepresentations allegedly made by defendants is insufficiently set forth. Plaintiffs simply aver that every promise made by IDA and GE at the New York City meeting and reiterated by GE in its two proposals was false when made and contributed to the damages suffered by plaintiffs. However, defendants concededly made good on *some* of their promises; for example, GE did, as promised, purchase twenty-six percent of IPC's stock. Accordingly, plaintiffs' fraud claim is not pleaded with the specificity required by Rule 9(b). That claim is therefore hereby dismissed.

■ Plaintiffs' present complaint does pass muster with respect to their obligation to plead facts from which an inference of scienter can be drawn. The complaint alleges that defendants made numerous promises to plaintiffs, which promises induced substantial reliance on plaintiffs' part. Once the reliance induced by the promises occurred, however, defendants almost immediately and without even a colorable justification ceased performance of their promises. While a mere failure of promised performance normally does not permit a factual finding that the defendant never intended to perform the promised act, *see Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946, 948 (3d Dep't 1976), *aff'd,* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977), the trier of fact would surely be permitted to draw such an inference of scienter from the abject failure of performance that allegedly occurred here. Moreover, to the extent it might be said that plaintiffs will, at trial, be required to put on more proof of scienter than that set forth above in order to prevail on their fraud claim, the Court observes that the source of such additional proof lies within defendants' control. Rule 9(b) is not a vehicle by which potentially meritorious claims are to be driven out of court because the plaintiff has failed to allege facts that he can only obtain through taking discovery that he has thus far been denied. *Credit & Finance Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 567 (2d Cir.1981). Here, the facts of which plaintiffs are aware reasonably support their claim that defendants acted with scienter; having alleged those facts, they cannot in justice be asked to go further at this juncture of the litigation, and the Court declines to interpret Rule 9(b) as demanding that they do.

■ The Court has determined to permit plaintiffs an opportunity to cure the present defect in their complaint by serving and filing an amended complaint. In order to bring their fraud claim into compliance with Rule 9(b), plaintiffs must narrow their field of fire and identify the *particular* representations that they contend were false. Further, they must distinguish the misrepresentations allegedly made by GE from those allegedly made by IDA, in order that *each* defendant can be apprised of the nature of the claim against it. It will thus not suffice for plaintiffs to serve and file an

amended complaint that simply sets forth a list of misrepresentations allegedly made by "the defendants." *See Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982).

Accordingly, defendants' motion to dismiss plaintiffs' third cause of action pursuant to Rule 9(b), Fed.R.Civ.P., is granted. Plaintiffs are hereby granted leave to serve and file an amended complaint that pleads fraud with the particularity required by Rule 9(b). In the event plaintiffs determine to replead, they shall serve and file their amended complaint within thirty (30) days of the date of this opinion.

## CONCLUSION

Defendants' motion is granted in part and denied in part. The motion is denied insofar as it seeks dismissal of the complaint in its entirety either for lack of subject matter jurisdiction, for lack of personal jurisdiction, or pursuant to the doctrine of *forum non conveniens.* The motion is granted insofar as it seeks dismissal of the third cause of action for failure to plead fraud with particularity. Plaintiffs are hereby granted leave to replead the third cause of action by serving and filing an amended complaint within thirty (30) days of the date of this opinion. While the Court is mindful of defendants' request that this action be stayed pending the disposition of related litigation now underway before the courts of Ireland, it believes, in light of all the circumstances, that the interests of the parties and of the sound administration of this Court's docket are better served by a speedy resolution of this action than by an indefinite stay of proceedings. Accordingly, discovery is to be completed by January 10, 1983, and a pretrial order is to be filed by February 10, 1983.

It is so ordered.