Adolph W. SCHMIDT, et al., Plaintiffs,

v.

The POLISH PEOPLE'S REPUBLIC,
Defendant.

No. 82 Civ. 7971 (RLC).

United States District Court,
S.D. New York.

Jan. 16, 1984.

24

James J. Armenakis, P.C., Abberley Kooiman Marcellino & Clay, New York City, for plaintiffs.

Haight, Gardner, Poor & Havens, New York City, for defendant; Theodore M. Sy-

sol, William J. Honan, III, Mark C. Flavin, Barbara A. Ritomsky, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs, trustees for the former stockholders of the Standard Car Finance Corp. ("Standard"), brought this suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA" or "Act")[1] seeking to recover on certain defaulted Treasury notes of the Republic of Poland.[2] Defendant has moved to dismiss the complaint, contending that (1) the Court lacks jurisdiction over the subject matter; (2) the Court lacks jurisdiction over defendant; (3) venue is improper; and (4) the action is barred by the applicable statute of limitations. The Court agrees that plaintiffs' claim is time barred, and the motion is, therefore, granted.

*Background*[3]

In 1926, a representative of the Polish government contacted A.W. Mellon, the Pittsburgh financier, in an effort to secure financing for the construction of several thousand railroad cars. The agreement reached after extensive negotiations in New York and Pittsburgh was implemented through a two-part contract. The first contract, executed on December 6, 1929, between the Polish State and the Polish firm of Lilpop, Rau & Lowenstein ("Lil-

pop"), provided that Lilpop would manufacture the cars and receive payment, in part, in Polish Treasury notes. The contract expressly acknowledged that Lilpop would, in turn, sell the notes to Standard.[4] The second contract, executed on February 5, 1930, between Lilpop and Standard, provided for Standard's purchase of the Treasury notes and its acquisition of Lilpop's interest in the railway cars as security for the notes.

Standard redeemed the notes as they fell due at the New York City offices of National City Bank until October 1936, when Poland defaulted.[5] The parties renegotiated the debt in New York and on September 28, 1937, signed a new agreement which called for the cancellation of the 426 remaining notes and the issuance of 78 new notes bearing a lower interest rate. The old and new notes were exchanged in New York on March 1, 1938, and the latter were made payable at National City Bank. Between April 1938 and April 1939, Standard redeemed nine of the new notes. Poland defaulted again in October 1939 as World War II had begun.

In 1960, Poland and the United States concluded an agreement whereby Poland paid the United States $40 million over 20 years in satisfaction of the claims of American nationals whose property had been nationalized by the Polish government after the War.[6] Poland had nationalized the

---

**1.** Act of October 21, 1976, Pub.L. 94–583, 90 Stat. 2891, *codified at*, 28 U.S.C. §§ 1330; 1332(a)(2)–1332(a)(4); 1391(f); 1441(d); and 1602–1611.

**2.** Defendant Polish People's Republic is the successor government to the Republic of Poland.

**3.** For the purpose of deciding this motion, to the extent that there is any dispute over the relevant facts, the Court has liberally construed plaintiffs' version and accepted its veracity. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 303 n. 6 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1100 (S.D.N.Y.1982) (Ward, J.).

**4.** Article 16 stated, in relevant part, "The Company [Lilpop] declares that it has entered into an agreement with the Standard Car Finance

Corporation, incorporated under the laws of the State of Delaware, United States of America, by which the Corporation has agreed to purchase from the Company Treasury Notes of the Republic of Poland provided for by this agreement..." Exh. 3 to Schmidt Aff.

**5.** To facilitate resale of the notes, Article 7 of the Poland-Lilpop contract provided that the notes be payable in gold coin of the United States. *Id.*

**6.** Agreement Between The Government Of The United States Of America And The Government Of The Polish People's Republic Regarding Claims Of Nationals Of The United States, July 16, 1960, 11 U.S.T. 1953 ("Polish Claims Agreement").

115 railroad cars manufactured by Lilpop and owned by Standard that had survived the War, and in 1964, Standard filed a claim with the Foreign Claims Settlement Commission ("FCSC") under the Polish Claims Agreement. Between 1964 and 1980, $88,000 was paid to Standard by the FCSC out of the $40 million fund. Standard returned ten of the 69 outstanding notes to Poland in consideration of the payment.

Standard also filed a claim with the FCSC pursuant to Title II of the War Claims Act of 1948, 50 U.S.C. app. § 2017(a). This claim sought compensation for the 4,923 railway cars lost or destroyed during the War. Standard received $3,150,285.32 on this claim from the FCSC in 1967. The funds used to pay the award were derived from the sale of German and Japanese assets in the United States, and no part of the payment was made by Poland.

In October 1980, plaintiffs' attorney met in Warsaw with Jan Boniuk, Advisor to the Polish Ministry of Finance. Plaintiffs also submitted a memorandum of law to the Polish government at that time. No settlement of plaintiffs' claim was reached, however. Aside from the two FCSC awards, Standard has received no payments in connection with the Treasury notes or the railway cars since 1939. In December 1982, Standard's trustees filed this action seeking payment on the 59 outstanding notes.[7] The notes have a face value of $4,474,-036.98. With interest from October 1939, plaintiffs demand judgment for over $15 million.

*Jurisdiction and Venue*

FSIA gives the Court jurisdiction over any non-jury civil action against a foreign state as long as the defendant is not entitled to sovereign immunity. 28 U.S.C. § 1330. The Act denies sovereign immunity to a foreign state in, *inter alia,* any case in which the action is based [1] upon a commercial activity carried on in the

United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Thus, in order to assume jurisdiction over this case, the Court must determine that plaintiffs' cause of action is based upon acts defendant performed in connection with commercial activity and that those acts and the underlying commercial activity constitute contacts with the United States sufficient to bring them within one of the clauses of § 1605(a)(2). *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1108–09 (S.D.N.Y.1982) (Ward, J.).

■ Defendant does not dispute that in contracting with Lilpop for the construction of railway cars, issuing Treasury notes to pay for the cars and renegotiating the debt represented by the notes, Poland engaged in commercial activity. Contracting with a manufacturer to produce a commodity and issuing bonds to raise the necessary capital are both activities in which a private profit-making corporation might well engage. As such, they are commercial activities within the meaning of FSIA. *IAM v. OPEC,* 649 F.2d 1354 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *see,* H.R.Rep. No. 94–1407, 94th Cong. 2d Sess. 16, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6615 ("House Report"). Moreover, the House Report on FSIA specifically listed the purchase of equipment and the borrowing of money as activities that would be deemed commercial under the Act. House Report at 6616.

---

7. Plaintiffs also state causes of action for the monies owing on the original Treasury notes and for the value of the railroad cars. The

three causes of action are pleaded in the alternative.

The Court is also convinced that if plaintiffs' allegations are true, their cause of action is based on acts sufficiently connected to the United States to deprive defendant of sovereign immunity under § 1605(a)(2). Even if, as plaintiffs apparently concede, defendant's commercial activity was not carried on in the United States, within the meaning of clause [1], but rather in Poland, plaintiffs' cause of action is based upon acts performed in the United States, within the meaning of clause [2].[8] The negotiations that led to Standard's financing of the railroad car construction took place in New York and Pittsburgh and this contact with the United States is sufficiently substantial to fall under § 1605(a)(2) even though the formal contract may have been executed in Poland. *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. at 1113–14; *see,* House Report at 6615 (commercial activity in the United States includes negotiating or executing a loan agreement in this country).[9] In addition, the original notes were payable at National City Bank in New York, the negotiations subsequent to Poland's first default took place in New York, the agreement permitting the cancellation of the old notes and the issuing of new ones was executed in this state, the physical transfer of the two series of notes took place here, and the new notes were made redeemable at the National City Bank.[10]

■ Even were the Court to conclude that all defendant's commercial activity and the specific acts connected to it took place in Poland, defendant would still lose its sovereign immunity under clause [3], as Poland's default on its Treasury notes had a "direct effect in the United States". In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra,* the Second Circuit held that the breach of a letter of credit payable in the United States to an American corporation had a direct effect in the United States. The effect was "direct" because the plaintiff was the beneficiary of the breached contract, and "in the United States" because the money was payable in the United States to a domestic firm. Here, plaintiffs were the beneficiaries of the 1937 contract resulting in the issuance of the new Treasury notes and Standard, a Delaware corporation, was to redeem those notes in New York City.[11] Defendant's breach therefore had a direct effect in the United States.

■ In light of the Court's conclusion that it has jurisdiction over the subject

**8.** Plaintiffs' action is based not only on defendant's default per se, but also on those acts which stand in a direct causal relationship to that default, e.g., the negotiation and execution of the financing agreements and the issuance of the two series of Treasury notes. *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1027 n. 22; (D.C.Cir.1981); *Gibbons v. Udaras na Gaeltachta, supra* at 1115 n. 11.

**9.** Defendant maintains that Poland never negotiated a loan or borrowed money in the United States. Rather, it issued notes to Lilpop which, in turn, sold those notes to Standard. Despite the form of the transaction, it is apparent that, in substance, Poland borrowed the money to pay for the railroad cars from Standard. The Poland-Lilpop contract specifically contemplated the Lilpop-Standard transaction (*see* n. 4, *supra*). Also, according to plaintiffs, representatives of defendant specifically sought out financing in the United States.

**10.** Despite plaintiffs' concession, it appears to the Court that in light of FSIA's definition of "commercial activity", defendant has carried on commercial activity in the United States within the meaning of clause [1]. Commercial activity is defined as "either a regular course of commercial conduct or a particular commercial transaction or act..." 28 U.S.C. § 1603(d). Thus, the financial "transaction" which took place in the United States is itself "commercial activity" in the United States. In fact, given the Act's expansive definition, which deems a single commercial act to be "commercial activity", it would seem that in the great majority of cases in which there was an act within the United States sufficient to meet the requirements of clause [2], that same act would qualify as "commercial activity carried on in the United States" under clause [1]. The House Report noted that the drafters of FSIA were aware that most clause [2] cases might also satisfy clause [1]. House Report at 6618; *see also, Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra* at 311 n. 30.

**11.** Although the 1937 notes were in bearer form, they were issued directly to Standard pursuant to the 1937 agreement cancelling the original notes.

matter of this action, it also has statutory jurisdiction over defendant as long as service of process was proper. 28 U.S.C. § 1330(b). No objection to service has been made. The Court's assertion of jurisdiction over defendant must also, of course, comport with due process, but the Court is unpersuaded by defendant's argument that defendant's contacts with the United States, outlined above, do not constitute the "minimum contacts" required by *International Shoe* and its progeny. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Poland, in essence, solicited and negotiated a loan in the United States and paid for that loan by issuing notes payable in U.S. dollars through a New York bank. By engaging in such a transaction, defendant availed itself of the privileges of American law, and litigation in this country should have been foreseeable to it in the event that it failed to meet its obligations. Defendant does not seriously contend that litigation in New York would substantially inconvenience it, and the interest of the United States in hearing this suit alleging commercial misdeeds by a foreign state is evident from the enactment of FSIA itself. *See, World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 297, 100 S.Ct. 559, 564, 567, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court*, 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

■ It should also be apparent from the foregoing that venue is properly laid in the Southern District of New York under 28 U.S.C. § 1391(f)(1). The negotiation of the original loan, the negotiations after the first default, the execution of the 1937 agreement and the payment (or non-payment) of the notes, taken together, make up a "substantial part of the events or omissions giving rise to [plaintiffs'] claim", and all took place in this District.

### Statute of Limitations

The parties agree that New York's six year statute of limitations governs this action. NYCPLR 213. Therefore, unless the cause of action accrued after December 14, 1976, the statute was tolled, or it would be inequitable to allow defendant to interpose its statute of limitations defense, this action is time barred.

Plaintiffs first argue that Poland has at all times been "absent from the jurisdiction" and that prior to the passage of FSIA, service of process would have been impossible. They conclude that until January 19, 1977, FSIA's effective date, the statute of limitations was tolled by NYCPLR 207, which provides that the statute does not run against the plaintiff if the defendant is without the state unless, *inter alia*, jurisdiction over defendant's person can be obtained by some means other than delivery of the summons within the state.

■ The cases construing NYCPLR 207 make it clear that the mere fact that the attempt to obtain jurisdiction over defendant by some means other than personal in-state service might fail is not dispositive. If such means are provided by law, the burden is on plaintiff to attempt their use. *Yarusso v. Arbotowicz*, 41 N.Y.2d 516, 393 N.Y.S.2d 968, 362 N.E.2d 600 (1977); *Burwell v. Whitmoyer*, 56 A.D.2d 950, 392 N.Y.S.2d 512 (3rd Dep't.1977); *Nelson v. Fraboni*, 38 A.D.2d 633, 326 N.Y.S.2d 934 (3rd Dep't. 1971). In *Goodemote v. McClain*, 40 A.D.2d 22, 337 N.Y.S.2d 79 (4th Dep't. 1972), for example, the defendant left New York for fourteen months after a car accident. Plaintiff argued that the statute of limitations was tolled by NYCPLR 207 during defendant's absence but the Court disagreed, holding that plaintiff had failed to seek a court order under NYCPLR 308(5) directing service of process in some other manner than in-state delivery. The question before the Court is thus whether any means of obtaining jurisdiction over defendant was available to plaintiff prior to December 1976.

■ It is indisputable that FSIA alleviated many of the difficulties attendant upon obtaining personal jurisdiction over a foreign state. *See,* House Report at 6606. Nevertheless, ten years before FSIA, the Second Circuit explicitly held that *in personam* actions against foreign governments were proper and that the district courts could fashion an appropriate procedure under F.R.Civ.P. 83 for service of process. *Petrol Shipping Corp. v. Kingdom of Greece, Ministry of Commerce, Purchase Directorate,* 360 F.2d 103 (2d Cir.1966); *see, Victory Transport Inc. v. Comisaria General de Abastecimientos Transportes,* 336 F.2d 354 (2d Cir.1964). Other courts followed suit. *Republic International Corp. v. Amco Engineers, Inc.,* 516 F.2d 161 (9th Cir.1975); *Renchard v. Humphreys & Harding, Inc.,* 59 F.R.D. 530 (D.D.C.1973); *see, National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 636 (S.D.N.Y.1978) (Goettel, J.), *aff'd,* 597 F.2d 314 (2d Cir.1979); *see generally,* 4 Wright & Miller, Federal Practice and Procedure § 1111. Plaintiffs, however, made no effort to commence an action. In view of the New York Court of Appeals' holding that a plaintiff cannot extend the statutory period for initiating suit if any procedure is available to effect service of process, *Yarusso v. Arbotowicz, supra,* the Court finds the tolling provision of NYCPLR 207 inapplicable to this case.[12]

Plaintiffs also argue that the statute of limitations was tolled by defendant's acknowledgement and partial payment of the debt. Specifically, plaintiffs point to (1) the fact that the Treasury notes were listed as State debts in 1939, 1940 and 1946; (2) a 1960 letter from Stanislaw Raczkowski, a Polish plenipotentiary, to Assistant Secretary of State Foy D. Kohler confirming Poland's intent to settle the problem of defaulted Polish bonds issued between 1919 and 1939 by direct talks with American bondholders; (3) the payments made pursuant to the two FCSC awards; and (4) the 1980 Warsaw meeting between plaintiffs' attorney and Jan Boniuk, an advisor to the Polish Ministry of Finance.

■ An acknowledgment sufficient to toll the statute of limitations must be in writing and signed by the party to be charged. New York General Obligations Law § 17–101. It must recognize an existing debt and contain nothing inconsistent with an intention on the debtor's part to pay it. *Lew Morris Demolition Co. v. Board of Educ. of New York,* 40 N.Y.2d 516, 387 N.Y.S.2d 409, 411, 355 N.E.2d 369, 371 (1976). If these conditions are met, the statute of limitations begins to run anew as of the date of the acknowledgment. *Id.; Bernstein v. Kaplan,* 67 A.D.2d 897, 413 N.Y.S.2d 186, 187–88 (2d Dep't.1979). The official listing of the Treasury notes as State debts would likely satisfy this standard, and the same is at least arguably the case with respect to the Raczkowski letter.[13] However, the former could, in any case, have extended the limitations period only to 1952, and the latter only to 1966. The 1980 Warsaw meeting did not produce any writing referring to the debt and thus

---

**12.** The D.C. Circuit rejected an argument somewhat similar to plaintiffs' in *Gilson v. Republic of Ireland,* 682 F.2d 1022 (D.C.Cir.1981). The Gilson plaintiff also argued, although not on service of process grounds, that the statute of limitations was tolled until passage of FSIA. The Court conceded that the Act may have increased plaintiff's chance of success and removed some of the procedural obstacles to his action, but concluded that "to say that any action was effectively barred before FSIA is not true." 682 F.2d at 1025.

**13.** The Raczkowski letter states, in relevant part:

In connection with the interest expressed by the Government of the United States of America in the settlement of outstanding dollar bonds, issued or guaranteed by the Polish government in the United States during the period 1919 to 1939, I have the honor to inform you that the Polish government *confirms its intention to settle the problem of this* bonded indebtedness by direct talks with American bondholders or their representatives.

Whether this statement adequately acknowledges that debt or merely acknowledges that a problem exists, and whether it is sufficient to toll the statute of limitations in light of the fact that it was sent not to plaintiffs but to the United States government are questions the Court need not reach.

fails to meet the threshold statutory requirement for an acknowledgment.

 A payment by the debtor to the creditor tolls the statute of limitations only if it is a payment of a portion of an admitted debt under circumstances indicating an unequivocal intention to pay the balance. *Lew Morris Demolition Co., supra,* 387 N.Y.S.2d at 411, 355 N.E.2d at 371; *Crow v. Gleason,* 141 N.Y. 489, 493, 36 N.E. 497 (1894); *Bernstein v. Kaplan, supra* 413 N.Y.S.2d at 188; *Piccolino v. Massa,* 33 A.D.2d 643, 305 N.Y.S.2d 79 (4th Dep't. 1969). The creditor's perception of the motive behind the payment is not the issue. Rather, the debtor must have had an intention, express or implied, to pay the rest of the debt. *See generally,* 36 New York Jur. § 143. The $88,000 payment which Standard received in installments between 1964 and 1980 on its Polish Claims Agreement award did not toll the statute because Standard received the money not as part payment on the Treasury notes, but as compensation for the 115 railway cars nationalized by Poland. Although the Raczkowski letter may, as plaintiffs contend, have indicated Poland's intention to settle the claims of bondholders, the letter cannot transform a payment for nationalized railroad cars into a part payment on Treasury notes. The $40 million Poland gave to the United States pursuant to the Agreement was in satisfaction of the claims of American nationals whose property was nationalized. As the Raczkowski letter itself made clear, the Agreement was not addressed to the claims of bondholders. Moreover, even the validity of the claim for nationalized railway cars was determined and acknowledged not by Poland, but by the FCSC. Poland agreed to pay a single sum to the United States in final settlement of all claims for nationalized property. Article III of the Agreement left it to the United States government to determine to whom the money should be distributed. 11 U.S.T. at 1954.

 Lastly, plaintiffs argue that even if the statute of limitations was not tolled, Poland's conduct, taken as a whole, makes it "inequitable to permit [it] to interpose the defense ...", NYCPLR 17–103(4)(b), because Poland "lulled the plaintiff into a false sense of security that the notes would be paid without resort to litigation." Plaintiffs' Reply Memorandum at 15. *See, Dupuis v. Van Natten,* 61 A.D.2d 293, 402 N.Y.S.2d 242 (3rd Dep't.1978); *Robinson v. City of New York,* 24 A.D.2d 260, 265 N.Y.S.2d 566 (1st Dep't.1965); *Kyle v. Village of Catskill,* 81 Misc.2d 1035, 367 N.Y. S.2d 158 (Sup.Ct.Green Co.1975).

It is apparent from the face of plaintiffs' 1964 application to the FCSC under the War Claims Act that the 1939, 1940 and 1946 listings of the notes as State debts, the signing of the Polish Claims agreement and the 1960 Raczkowski letter did not "lull plaintiffs into a false sense of security..." As part of their statement of the claim, plaintiffs wrote, "Up to the present time Poland has denied any liability for the payment of the balance due on its notes above mentioned." Exh. 10 to Schmidt Aff. In response to a question on the application as to whether plaintiffs expected to recover on their claim from any other source, plaintiffs wrote, "Remote possibility of some recovery from Poland." *Id.* These statements are simply inconsistent with plaintiffs' present contention that they were deceived into sleeping on their rights.

For the reasons the Court has detailed above, the receipt of $88,000 from the FCSC on their claim for 115 nationalized railroad cars should not have inhibited plaintiffs from suing on the Treasury notes. Even more clearly, the receipt of an FCSC award under the War Claims Act could not have affected plaintiffs' perception of Poland's intention with respect to the notes. That award was made by the United States government and paid out of the proceeds of the sale of German and Japanese assets. Poland was uninvolved in any aspect of that transaction.

Any representations made by Poland at the 1980 Warsaw meeting could estop defendant from asserting the statute of limitations only if plaintiffs still had a viable cause of action at that time. Since the

statute was not tolled at any time within the six years prior to the meeting, and the cause of action accrued more than six years before it, plaintiffs' suit was already time barred when the meeting took place. Nothing said at the 1980 meeting could have deceived plaintiffs into sleeping on their rights, as those rights were already unenforceable.

Defendant's motion to dismiss the complaint is granted.

IT IS SO ORDERED.