**CRIMSON SEMICONDUCTOR, INC., Plaintiff,**

v.

**ELECTRONUM, Defendant.**

**No. 84 Civ. 2124 (RLC).**

United States District Court, S.D. New York.

Jan. 29, 1986.

Bryan Ross, New York City, Adduci, Dinan & Mastriani, Washington, D.C., for plaintiff.

Dunn & Zuckerman, P.C., New York City, for defendant; Stuart M. Fischman, of counsel.

## ROBERT L. CARTER, District Judge.

Plaintiff Crimson Semiconductor, Inc. ("Crimson"), a New York corporation, brought suit against Electronum, a Romanian state-owned trading company, asserting two claims of breach of contract. The defendant has moved to amend its answer and to dismiss the complaint, claiming sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), Pub.L. 94–583, 90 Stat. 2891, *codified at* 28 U.S.C. §§ 1330, 1332(a)(2)–(4), 1391(f), 1441(d) and 1602–1611, lack of personal jurisdiction, and *forum non conveniens.* Electronum also argues that the second count is barred by Uniform Commercial Code § 2–725, which establishes a four year statute of limitations for breaches of contracts for the sale of goods.[1]

## BACKGROUND

Crimson buys and Electronum sells electronic components. The exhibits demonstrate that the two companies did business frequently, if acrimoniously, between 1972 and 1983. They communicated mostly by letter and telex. Electronum has no office or representative in the United States.

However, representatives of Electronum did meet with plaintiff in New York several times. *See* Ross and Hummel Affidavits, Exhibits 42, 44–46 (February 22, 1985) (hereinafter designated as "Exhibit ___"). There is evidence that, at least during the pendency of this lawsuit, Electronum advertised its products in an American electronics trade publication. *See* Exhibits 34–37. There is also evidence that officials at Romania's consulate in New York sought to promote and facilitate trade between Crimson and Electronum. *See* Exhibits 43 & 47.

The events underlying Count Two of the complaint, chronologically prior to Count One, are as follow. On February 2, 1977, Crimson and Electronum signed a "Memorandum of Understanding" whose terms provided that, for a six-month period, Crimson would explore the United States market for Electronum products. After these six months expired, the memorandum provided that Crimson and Electronum would "negotiate and conclude" a distributorship agreement if Crimson succeeded in generating $2 million in American orders for Electronum in 1977. *See* Exhibit 31. Negotiations did continue, in part at meetings in New York, but no general distributorship agreement ensued. In January, 1978, Crimson placed orders with Electronum for a component called "2N404A." Crimson had already signed contracts to supply these components to its American customers. Electronum agreed to "protect" Crimson as to future reorders from these customers, and to pay a five per cent commission to Crimson. *See* Exhibit 32. Crimson established a letter of credit for these orders. Many telexes crossed the Atlantic: the orders were altered several times; the letters of credit were amended and extended. On November 10, 1978, Electronum wrote that it could not ship the components to Crimson on account of unnamed "problems." On December 11, 1978, Crimson notified Electronum that it had learned that

---

1. As this memorandum was being written, Crimson filed a motion to supplement its papers in opposition to Electronum's motion to dismiss. The motion is denied as untimely.

Electronum had shipped 2N404A components to one of Crimson's customers.

Almost five years later—on August 30, 1983—Crimson ordered 125,000 pieces of an integrated circuit called "IC 7406" from Electronum, and opened an irrevocable letter of credit through Barclay's Bank of New York to Manufacturer's Hanover Trust Company of New York. On September 6, 1983, Electronum confirmed the order and noted that the letter of credit was to be payable through the Romanian Bank of Foreign Trade in Bucharest. Again, telexes were wired back and forth: conditions of sale were altered; shipping dates changed; letters of credit amended and extended. As before, Electronum failed to ship the components to Crimson. On October 31, 1983, Crimson told Electronum that it considered their contract breached. This lawsuit was filed five months later, on March 23, 1984.

## DISCUSSION

### I. *Jurisdiction*

Subject-matter jurisdiction of this court is governed by the FSIA. That statute immunizes—subject to certain exceptions—foreign states and their agencies or instrumentalities from suit in both federal and state court. 28 U.S.C. § 1604. If the case falls within one of the Act's exceptions, the court has subject-matter jurisdiction. That power plus adequate service of process yields statutory personal jurisdiction. 28 U.S.C. § 1330. However, this court's inquiry into personal jurisdiction does not end when the statutory requirements are satisfied. We must continue to scrutinize the defendant's contacts with the forum to assure that they meet the Fifth Amendment's guarantee of due process of law, articulated in terms of "fair play and substantial justice." *International Shoe v.*

*Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[2]

■ Both parties concede that Electronum is an "agency or instrumentality" of Romania within the meaning of the Act. 28 U.S.C. § 1603(b). The FSIA grants Electronum sovereign immunity unless the plaintiff can show that the cause of action falls within one of the Act's exceptions. The sole relevant exception is that for a sovereign's commercial acts. 28 U.S.C. § 1605(a)(2). That subsection allows subject matter jurisdiction where the action is:

> based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Interpretation of this section presents the court with a mythic quest to find one of three incorporeal beings within the borders of the United States: commercial activity[3], an act connected with that activity, or the act's direct effect. Once one of these is located in the United States, there is an adequate nexus between the cause of action and this country on which to base jurisdiction.

Where the plaintiff is a United States corporation, the task of statutory interpretation is facilitated by the breadth that courts have given to the "direct effect" clause of § 1605(a)(2). In *Carey v. National Oil Corp.*, 592 F.2d 673 (2d Cir.1979) (*per curiam*), the Second Circuit held that a direct effect can arise from a breach of a contract as well as from a tort. In *Texas Trading & Milling Corp. v. Federal Re-*

---

2. *International Shoe* articulated due process requirements under the Fourteenth Amendment; however, its guarantee is coextensive with that of the Fifth Amendment, which pertains here. *Texas Trading and Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 315 n. 37 (2d Cir.1981).

3. "Commercial activity" can be "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Electronum's activities are wholly and indisputably commercial: the buying and selling of electronic components.

*public of Nigeria,* 647 F.2d 300 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), the Second Circuit expanded this reading further and held that any failure to pay an American corporation in the United States creates a direct effect "in" the United States. Similarly, in *Schmidt v. Polish People's Republic,* 579 F.Supp. 23 (S.D.N.Y.1984) (Carter, J.), *aff'd,* 742 F.2d 67 (2d Cir.1985), this court held that there was a direct effect in the United States where an American corporation was the beneficiary of a contract payable in the United States.

For the purpose of determining the applicability of § 1605(a)(2), we assume that the acts on which these claims are based—defendant's failure to ship components to Crimson—took place wholly outside the United States.[4] We also assume that the commercial activity connected with this act—the sale of electronic components—took place wholly outside the United States.[5] Nonetheless, this case falls within § 1605(a)(2) because the breach had a "direct effect" in the United States, namely, a financial loss suffered by the beneficiary of the contract, a New York corporation.[6] It is of no significance that the American contract beneficiary here was the buyer, and not the seller as in *Texas Trading* and *Schmidt.* Delivery was to have been made in the United States. The loss to plaintiff—the benefit of its bargain—is the same as the loss to the sellers in *Texas Trading* and *Schmidt.* This effect provides an adequate nexus between the cause of action and the United States. The FSIA confers subject-matter jurisdiction upon this court.

■ Electronum does not protest the service of process upon it. The FSIA thus confers personal jurisdiction over the defendant upon this court.[7] We must now ask whether the defendant's contacts with the forum satisfy the constitutional requirements of due process. The constitutional test is set forth in *International Shoe, supra,* and its progeny: *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), *Kulko v. California Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). As the court in *Texas Trading* observed, these cases establish a set of four inquiries to guide the assessment of a defendant's contacts with the forum: "[1] the extent to which defendants availed themselves of the privileges of American law, [2] the extent to which litigation in the United States would be foreseeable to them, [3] the inconvenience to defendants of litigating in the United States, and [4] the countervailing interests of the United States in hearing the suit." Note that the relevant contacts here are not merely those with New York State, but those with the United States as a whole.

First, we enumerate Electronum's contacts with the United States. It did business with the plaintiff several times over more than a decade. It did business with

---

4. In that Count Two is also based on Electronum's shipment of components to Crimson's American customers, the assumption is unwarranted, for that action is arguably "in" the United States.

5. As noted above, at least part of the transaction at issue in Count Two did take place in New York.

6. In light of *Texas Trading, East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383 (S.D.N.Y.) (Cooper, J.), aff'd, 610 F.Supp 806 (2d Cir.1979), on which defendant heavily relies, can no longer be considered good law. *Terra* held that there was no "direct effect" in the United States where a New York plaintiff allegedly suffered from defendant's wrongful interference with its business.

7. Crimson argues that Electronum waived its right to protest personal jurisdiction because it failed to raise that issue in a "meaningful way" in its answer. Forfeiture of a personal jurisdiction claim pursuant to Rule 12(h)(1), F.R.Civ.P. occurs only where that claim is omitted from the first responsive pleading. Electronum's answer clearly asserted that "this court lacks jurisdiction over the defendant in personam and in rem." *Answer,* p. 1. *The rule requires no more* to avoid forfeiture.

other American corporations as well. This business involved the delivery of Electronum products to the United States. Electronum sought a United States market for its goods by engaging plaintiff to test American demand for its products. Electronum's representatives visited New York several times in order to negotiate a distributorship agreement that would expand Electronum's business here. Electronum received and made payments through New York banks. Electronum advertised in national trade publications. Finally, in an attachment proceeding instituted during the pendency of this suit, Electronum did not hesitate to resort to this country's courts in order to extract payment from Crimson. *See* Exhibit 48.

This list speaks for itself. Electronum purposefully availed itself of the privileges of American law by trying to create a market for its products here. It has already reaped the benefits of American law by using New York's attachment proceedings against Crimson. Litigation here could not be unforeseeable to it since it sought to deliver its products here. Moreover, litigation here will be no more inconvenient to Electronum than were the business visits that its representatives made. As to the final inquiry, the FSIA itself demonstrates Congressional solicitude for the rights of Americans involved in commerce with foreign instrumentalities. Clearly, the United States has an interest in hearing this dispute. The court's exercise of personal jurisdiction over Electronum does not offend the Constitution.

## II. *Forum Non Conveniens*

■ Although the court has the power to adjudicate this case, Electronum argues that it would be in the interest of both convenience and justice for us to decline to exercise that power. The doctrine of *forum non conveniens* allows the district court to dismiss a case where the balance of private and public interests outweighs the ordinary deference given to a plaintiff's forum choice. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055

(1947). That decision is consigned to the court's discretion. *Id.* at 508, 67 S.Ct. at 843. The plaintiff's choice is not easily disregarded, particularly where the plaintiff is a citizen of the forum. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 256, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). The FSIA's grant of jurisdiction, however, does not alter the *forum non conveniens* balance in plaintiff's favor. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490 n. 15, 103 S.Ct. 1962, 1970 n. 15, 76 L.Ed.2d 81 (1983); *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390 (2d Cir.1985); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1119 (S.D.N.Y.1982) (Ward, J.). Once the court has jurisdiction over a case involving a foreign sovereign by virtue of that sovereign's commercial activity, the sovereign is to be treated like any other private party. *Id.*

■ Our first step must be to determine that there is an adequate alternative forum that can resolve this dispute. *Pain v. United Technologies Corp.,* 637 F.2d 775, 784 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). Electronum has not sustained its burden of showing that an "adequate" alternative that can hear the "whole" case exists. For this reason, we must deny the motion to dismiss on the ground of *forum non conveniens.*

Electronum proposes Romania as an alternative forum. The burden is on the moving party to show that there is no statute of limitations bar in the alternative forum. *Kontoulas v. A.H. Robins Co.,* 745 F.2d 312, 316 (4th Cir.1984). In its answer, Electronum argues that "the claims and causes of action in the complaint are barred by the three year statute of limitations under Decree 167/1958 of the Laws of Romania." Amended Answer ¶ 21. Although Count One would not be time-barred under Romanian law, Count Two clearly would be. Assuming that this court would not, even if it were to apply Romanian law,

apply a Romanian statute of limitations,[8] Count Two could be heard here [9] but not in Romania. Many cases have held that statute of limitations bars arising after the instigation of a lawsuit preclude a *forum non conveniens* dismissal. *See, e.g., Kontoulas, supra.* Yet our research uncovers only one case discussing the adequacy of a forum in which the claim would have been stale when brought. *Castillo v. Shipping Corp. of India,* 606 F.Supp. 497 (S.D.N.Y. 1985) (Goettel, J.).

In *Castillo,* this court found that it had no subject-matter jurisdiction over a claim under the FSIA. The suit was brought by a Dominican citizen against an Indian government-owned shipping corporation and arose out of an accident that took place in the Dominican Republic. The court first held that the action was not "based upon" India's commercial activities in this nation. In the alternative, it held that a *forum non conveniens* dismissal was warranted. Plaintiff had argued that the suit could not be dismissed on *forum non conveniens* grounds because New York was the only available forum, the six-month limitations period in the Dominican Republic having expired before the New York suit was brought. The court held that "[i]t would be a strange world if a litigant could 'bootstrap' himself into a New York court by missing the statute of limitations in the proper forum." *Id.* at 504.

*Castillo* 's reasoning is based on the unstated premise that the court lacked jurisdiction in the first place, an incorrect premise for any *forum non conveniens* inquiry. As discussed above, the court has jurisdiction over this suit. The statute of limitations bar in Romania does not go to the merits of plaintiff's claim, or to the quantum of damages, but to the very existence of the claim in the foreign forum. Thus, this is one of the "rare circumstances" in which the foreign forum is "clearly unsatisfactory." *Piper,* 454 U.S. at 255 n. 22, 102 S.Ct. at 265 n. 22. *See Munsell v. La*

*Brasserie Molson du Quebec Limitee,* 623 F.Supp. 100 (E.D.N.Y.1985) (conditioning *forum non conveniens* dismissal upon defendant's waiver of statute of limitations claim that would have barred suit if originally brought in alternative forum). The possible Romanian statute of limitations bar on Count Two of the complaint renders Romania an inadequate alternative forum, making dismissal on *forum non conveniens* grounds improper.

As we discuss below, the ability of this court to hear Count Two of the complaint is not, at this stage of the litigation, beyond dispute. Moreover, we could condition a *forum non conveniens* dismissal on defendant's waiver of a Romanian statute of limitations defense. *See, e.g., Pain,* 637 F.2d at 785; *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 881 (2d Cir.1978). Thus, we continue the *forum non conveniens* inquiry into the private and public interests at stake in this litigation. Even if Romania does provide an adequate alternative forum, the balance of these factors does not make a *forum non conveniens* dismissal appropriate in this case.

First, the private interests. Electronum presents no facts that would justify ousting Crimson from its home court. It claims that all of its witnesses are in Romania. Crimson, on the other hand, claims that all of its witnesses are in the United States. Although highly detailed information on this score is not necessary, *Piper,* 454 U.S. at 259, 102 S.Ct. at 267–66, neither party asserts even a gross estimate of the number of witnesses that it intends to call. Electronum stresses that it would be highly inconvenient for its witnesses to travel here in order to participate in this litigation because they are "very highly placed." Their status is irrelevant. The *Gibbons* statement that the FSIA treats foreign states as private persons when they behave as such is at least as true here, where the foreign party seeks the advantage of its

---

**8.** A federal court sitting in diversity would apply the foreign forum's statute of limitations only if it were a substantive part of the cause of action.

**9.** The New York statute of limitations is discussed *infra,* at 910.

own foreign status, as it was in *Gibbons,* where its opponent did. It is simply inappropriate for the court to consider the position that Electronum's unnamed witnesses might occupy in Romania. The private interests are thus in equipoise; litigation here is no more inconvenient for Electronum than litigation in Romania would be for Crimson.

Next, the public interest. Electronum argues that Romania has the sole right to hear this suit because Romanian law applies. This argument goes too far; if Romanian law governs the case under New York's choice of law rules, this court will of course apply it. Still, the court's unfamiliarity with Romanian law is a factor favoring dismissal that is clearly relevant to our inquiry. *Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843. Yet the applicability of foreign law does not, by itself, justify a *forum non conveniens* dismissal. *Gibbons,* 549 F.Supp. at 1123. *See Manu International, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 67 (2d Cir.1981). Overall, it appears that the public interests in this suit balance each other out. Both Romania and the United States have an interest in deciding "local" controversies. In a breach of contract action such as this, with one party in each country, in practical terms the controversy is situated here as much as it is in Romania.

Neither private nor public interest tips the balance in favor of a Romanian forum for this case. Thus, the court will respect the plaintiff's choice of a forum and deny the motion to dismiss on grounds of *forum non conveniens.*

### III. *Statute of Limitations*

Electronum next argues that the second count of the complaint is time-barred. It claims that the Uniform Commercial Code § 2–725, establishing a four-year limitation period for sales of goods, should be applied to Crimson's claim. Apparently, Electronum construes the complaint as dealing only with the non-delivery of component 2N404A; this purported breach occurred in December, 1978, a good five years before this case was brought.

Crimson counters that the claim is one for breach of an agency contract, to which the more liberal six-year limitation period of N.Y.C.P.L.R. § 213 applies. Crimson bases this characterization of the parties' relationship on the February, 1977 "Memorandum of Understanding" between the parties. By its terms, that memorandum expired in August, 1978. Crimson, however, argues that subsequent communications from Electronum, in particular the January 25, 1978 telex (Exhibit 32), evidence a de facto agency relationship. If that is true, then Electronum's breach is not the nonshipment of component 2N404A to Crimson, but its shipment of the component to Crimson's American customers. Characterization of the relationship between the two parties is a factual issue that the court is unable to resolve at this stage of the litigation. Defendant here bears the burden of showing that the statute of limitations bars consideration of Count Two. *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238 (2d Cir.1984). *See Romano v. Romano,* 19 N.Y.2d 444, 447, 280 N.Y.S.2d 570, 573, 227 N.E.2d 389, 391–92 (1967). Electronum has not sustained that burden. Thus, the motion to dismiss Count Two is denied.

### IV. *Amending the Pleadings*

Electronum first answered Crimson's complaint on July 18, 1984. Six months later, Electronum moved to amend its answer. The proposed answer adds several affirmative defenses. The motion is unopposed, and the court perceives no prejudice to the plaintiff that might have been overlooked by counsel. Motions to amend pleadings are liberally granted. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). There is no reason to make an exception here. Electronum's motion to amend its answer is granted.

IT IS SO ORDERED.